**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| JASON FLAKER, Derivatively on Behalf of FEDEX CORPORATION,<br><br>        Plaintiff,<br><br>   v.<br><br>JAMES L. BARKSDALE, JOHN A. EDWARDSON, MARVIN R. ELLISON, SUSAN PATRICIA GRIFFITH, JOHN C. INGLIS, ALAN B. GRAF, KIMBERLY A. JABAL, SHIRLEY ANN JACKSON, R. BRAD MARTIN, JOSHUA COOPER RAMO, SUSAN C. SCHWAB, FREDERICK W. SMITH, DAVID P. STEINER, PAUL S. WALSH, DAVID J. BRONCZEK, RAJESH SUBRAMANIAM, DAVID L. CUNNINGHAM, DONALD F. COLLERAN, and MICHAEL C. LENZ,<br><br>        Defendants,<br><br>   -and-<br><br>FEDEX CORPORATION,<br><br>        Nominal Defendant. | Case No.:_____<br><br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Jason Flaker ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of nominal defendant FedEx Corporation ("FedEx" or the "Company"), submits this Verified Stockholder Derivative Complaint against defendants James L. Barksdale ("Barksdale"), John A. Edwardson ("Edwardson"), Marvin R. Ellison ("Ellison"), Susan Patricia Griffith ("Griffith"), John C. Inglis ("Inglis"), Alan B. Graf ("Graf"), Kimberly A. Jabal ("Jabal"), Shirley Ann Jackson ("Jackson"), R. Brad Martin ("Martin"), Joshua Cooper Ramo ("Ramo"), Susan C. Schwab ("Schwab"), Frederick W. Smith ("Smith"), David P. Steiner ("Steiner"), and Paul S. Walsh

("Walsh"), David J. Bronczek ("Bronczek"), Rajesh Subramaniam ("Subramaniam"), David L. Cunningham ("Cunningham"), Donald F. Colleran ("Colleran"), and Michael C. Lenz ("Lenz" and, collectively, the "Individual Defendants"), for breaches of their fiduciary duties, corporate waste, and unjust enrichment.  Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by his attorneys, which included a review of:  the Company's announcements and press releases; the pleadings filed in two federal securities class action lawsuits captioned, *Rhode Island Laborers' Pension Fund v. FedEx Corporation*, No. 1:19-cv-05990 (S.D.N.Y.), and *Karp v. FedEx Corporation*, No. 1:19-cv-06183 (S.D.N.Y.) (together, the "Securities Actions"); filings made by the Company with the U.S. Securities Exchange Commission (the "SEC"); corporate governance documents available on the Company's website; securities analysts' reports about FedEx; and news reports and other publicly available information about the Company.

## NATURE OF THE ACTION

1.      This stockholder derivative action arises from the Individual Defendants' breaches of fiduciary duties owed to the Company, as well as their complicity in constructive fraud, corporate waste, unjust enrichment, and violations of the Securities Exchange Act of 1934, from September 19, 2017 through December 18, 2018(the "Relevant Period").

2.      FedEx provides customer and businesses worldwide with a broad portfolio of transportation, e-commerce, and business services.  Since its inception, FedEx generated most of its revenues in the United States.  In its 2016 fiscal year,[1] for instance, FedEx generated 76% of its revenue from its U.S. operations.  And although FedEx generated a significant amount of

---

[1] FedEx's fiscal year ends on May 31, so FedEx's 2016 fiscal year ended May 31, 2016.

revenue internationally, the Company lagged behind its competitors, especially in Europe, and wanted to increase its market share.

3.      On April 7, 2015, FedEx announced that it had reached an agreement to acquire Netherlands-based TNT Express N.V. ("TNT"), one of the world's largest express delivery companies, for $4.8 billion in cash.  FedEx completed the acquisition on May 25, 2016.  To date, the acquisition of TNT has been FedEx's largest ever acquisition, and it raised the Company's international revenues as a percentage of FedEx's total revenues from 24% in FY2016 to 33% in FY2017.

4.      After completing the acquisition, FedEx immediately began working to integrate TNT's business into FedEx's legacy European operations.  FedEx initially acknowledged that the complete integration could take a number of years.  However, on March 31, 2017, roughly ten months after acquiring TNT, FedEx issued a three-year operating improvement target to achieve a $1.2 billion to $1.5 billion operating income improvement above its fiscal 2017 results (the "TNT Income Improvement Target").

5.      Unfortunately, TNT (now a subsidiary of FedEx) fell victim to a global cyberattack known as NotPetya, which spread a malware virus throughout its target's computer systems (the "Cyberattack").  The Cyberattack is considered one of the largest cyberattacks in history, causing more than $10 billion in harm to its victims.  As a result of the Cyberattack, which was announced in a press release on June 28, 2017, TNT's operations were severely impacted during the critical period of the integration process into FedEx's legacy European operations.

6.      Unknown to investors, however, FedEx began releasing materially false and misleading information beginning on September 19, 2017, when it released the Company's 2018 Q1 results.  During the related earnings call, the Individual Defendants assured investors that all

critical TNT systems were fully restored, and the remediation efforts would be completed by the end of September 2017.  The Individual Defendants also reaffirmed the TNT Income Improvement Target.  As a result, analysts issued positive reviews of FedEx, and FedEx's stock price increased 2.1% on September 20, 2017.

7.      Throughout the Relevant Period, the Individual Defendants continued to assure investors about TNT's recovery from the Cyberattack and reaffirmed the TNT Income Improvement Target.

8.      In reality, the Individual Defendants made materially false and misleading statements and/or failed to disclose that:  (i) TNT's overall package volume growth was slowing as TNT's large customers permanently took their business to competitors after the Cyberattack; (ii) as a result of the customer attrition, TNT was experiencing an increased shift in product mix from higher-margin parcel services to lower-margin freight services; (iii) the anticipated costs and timeframe to integrate and restore the TNT network were significantly larger and longer than disclosed; (iv) FedEx was not on track to achieve the TNT Income Improvement Target; and (v) as a result of the undisclosed negative trends and cost issues, FedEx's positive statements about TNT's recovery from the Cyberattack, integration into FedEx's legacy operations, customer mix, customer service levels, profitability, and prospects lacked a reasonable basis.

9.      Beginning on June 19, 2018, FedEx made several disclosures revealing the falsity of its previous representations.  Nevertheless, the Individual Defendants continued to assure investors that FedEx's TNT business had successfully recovered from the Cyberattack and would still be able to meet the TNT Income Improvement Target.

10.     The full extent of FedEx's material misrepresentations and omissions regarding TNT were revealed to investors on December 18, 2018, when FedEx reported a large profit miss

for its 2019 Q2.  FedEx revealed that the large profit miss was due to lower package volumes in Europe and a negative shift in TNT's product mix to lower margin freight business following the Cyberattack.  FedEx also lowered its earnings guidance and announced that the TNT Income Improvement Target was no longer viable.  On this news, FedEx stock dropped 12.2% to $162.51 per share on December 19, 2018.

11.     In addition, on August 13, 2018, certain of the Individual Defendants negligently issued a materially false and misleading Proxy Statement (the "2018 Proxy") urging stockholders to re-elect the Board under false pretenses.

12.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, FedEx has sustained damages more fully described below.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that the Complaint states a federal question.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

14.     This Court has personal jurisdiction over each defendant because they have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.  The Court has personal jurisdiction over nominal defendant FedEx because it is authorized to do business in this state, has consented to service in this state, and is incorporated within this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (i) a substantial portion of the transactions and wrongs complained of herein occurred in this District and (ii) Defendants have received substantial compensation and other transfers of money in the District by doing business and engaging in activities having an effect in this District.

## PARTIES

16.     Plaintiff is a current stockholder of FedEx common stock and has continuously held FedEx common stock since October 2014.  Thus, Plaintiff was a stockholder at the time of the transactions complained of herein.  Plaintiff is a citizen of Illinois.

17.     Nominal Defendant FedEx is a Delaware corporation headquartered in Memphis, Tennessee.  FedEx's common stock is listed on the New York Stock Exchange under the symbol "FDX."

18.     Defendant Barksdale served as a director of the Company from 1999 to September 2018.  In addition, Barksdale served on the Board's Information Technology Oversight Committee (the "IT Oversight Committee") during the Relevant Period.

19.     Defendant Edwardson has served as a director of the Company since 2003. Edwardson served as the Chair of the Board's Audit committee (the "Audit Committee") during the Relevant Period.  While the Company's stock price was inflated, Edwardson sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 19, 2018 | 1,160 | $242.30 | $281,124 |

20.     Defendant Ellison has served as a director of the Company since 2014.  In addition, Ellison served on the IT Oversight Committee during the Relevant Period.

21.     Defendant Graf has served as the Company's Chief Financial Officer since 1998. Graf is named as a defendant in the Securities Actions.  While the Company's stock price was inflated, Graf sold the following shares with insider information regarding the Company's market

manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| December 21, 2017 | 24,100 | $249.40 | $6,011,093 |

22.     Defendant Griffith has served as a director of the Company since March 2018. Additionally, Griffith served as a member of the IT Oversight Committee during the Relevant Period.

23.     Defendant Inglis has served as a director of the Company since 2015. Additionally, Inglis served as the Chair of the IT Oversight Committee during the Relevant Period.

24.     Defendant Jabal has served as a director of the Company since 2013. In addition, Jabal served as a member of the Audit Committee and IT Oversight Committee during the Relevant Period. While the Company's stock price was inflated, Jabal sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of her stock sale:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| November 1, 2017 | 3,980 | $225.60 | $897,703 |

25.     Defendant Jackson has served as a director of the Company since 1999. In addition, Jackson served as a member of the Audit Committee during the Relevant Period. While the Company's stock price was inflated, Jackson sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of

internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of her stock sale:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| November 2, 2017 | 3,730 | $225.70 | $841,860 |

26.     Defendant Martin has served as a director of the Company since 2011.  In addition, Martin served as a member of the Audit Committee during the Relevant Period.

27.     Defendant Ramo has served as a director of the Company since 2011.  In addition, Ramo served as a member of the Audit Committee and IT Oversight Committee during the Relevant Period.

28.     Defendant Schwab has served as a director of the Company since 2009.  In addition, Schwab served as a member of the IT Oversight Committee during the Relevant Period.

29.     Defendant Smith, the founder of the Company, has served as a director, Chairman of the Board and Chief Executive Officer ("CEO") of the Company since 1998.  Smith is named as a defendant in the Securities Actions.  While the Company's stock price was inflated, Smith sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| April 18, 2018 | 124,000 | $256 | $31,742,181 |

30.     Defendant Steiner has served as a director of the Company since 2009.  While the Company's stock price was inflated, Steiner sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of

internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| January 5, 2018 | 3,016 | $266 | $802,405 |

31.     Defendant Walsh has served as a director of the Company since 1996.  While the Company's stock price was inflated, Walsh sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| April 18, 2018 | 4,400 | $255 | $1,122,000 |

32.     Defendant Bronczek was the Company's Chief Operating Officer ("COO") and President during the Relevant Period.  Bronczek retired from the Company in February 2019. Bronczek is named as a defendant in the Securities Actions.  While the Company's stock price was inflated, Bronczek sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| January 2, 2018 | 46,555 | $225.50 | $11,894,261 |

33.     Defendant Subramaniam was the Company's Chief Marketing and Communications Officer and Executive Vice President ("EVP") during the Relevant Period. Subramaniam currently serves as the Company's COO and President.   Subramaniam is named as

a defendant in the Securities Actions.  While the Company's stock price was inflated, Subramaniam sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 21, 2017 | 6,750 | $219.60 | $1,482,401 |

34.     Defendant Cunningham was President and CEO of FedEx Express during the Relevant Period.  Cunningham retired from the Company in December 2018.  Cunningham is named as a defendant in the Securities Actions.

35.     Defendant Colleran was the Company's Chief Sales Officer and EVP during the Relevant Period.  Additionally, Colleran currently serves as FedEx Express's President and CEO. Colleran is named as a defendant in the Securities Actions.  While the Company's stock price was inflated, Colleran sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 21, 2017 | 10,000 | $220 | $2,200,002 |

36.     Defendant Lenz was the Company's Treasurer and Corporate Vice President during the Relevant Period.  Lenz is named as a defendant in the Securities Actions.

37.     Defendants Edwardson, Ellison, Griffith, Inglis, Jabal, Jackson, Martin, Ramo, Schwab, Smith, Steiner, and Walsh are collectively referred to herein as the "Director Defendants."

38.     Defendants Smith, Graf, Bronczek, Subramaniam, Cunningham, Colleran, and Lenz are collectively referred to herein as the "Officer Defendants."

39.     Defendants Edwardson, Jabal, Jackson, Martin, and Ramo are collectively referred to herein as the "Audit Committee Defendants."

40.     Defendants Barksdale, Inglis, Ellison, Griffith, Jabal, Ramo, and Schwab are collective referred to herein as the "IT Oversight Committee Defendants."

41.     Defendants Edwardson, Graf, Jackson, Smith, Steiner, Walsh, Bronczek, Subramaniam, Colleran are collectively referred to herein as the "Insider Selling Defendants."

42.     The Individual Defendants participated in the issuance and preparation of materially false and/or misleading statements by FedEx, including press releases and SEC filings. Because of the Individual Defendants' positions with FedEx, they were aware of the adverse material non-public information about the business of FedEx, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

43.     By reason of their positions as officers and/or directors of FedEx, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally, and not in furtherance of their personal interest or benefit.  Each officer and

director owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

44.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, directly and/or indirectly, exercised control over the wrongful acts complained of herein.

45.     As senior executive officers, directors, and/or controlling stockholders of a publicly-traded company, the Individual Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding FedEx's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

46.     To discharge their duties, the officers and directors of FedEx were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of FedEx were required to, among other things:

a.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.      conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

       c.      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

       d.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

       e.      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

       f.      ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

47.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

48.     In addition, FedEx maintains a Code of Business Conduct and Ethics (the "Code"), pursuant to which the Individual Defendants were required to "comply[ ] with the law wherever [FedEx] operate[s] and maintaining a high standard of business and personal ethics."  FedEx also maintains Corporate Governance Guidelines (the "Guidelines").  The Guidelines explicitly state:

**Basic Responsibilities of Board Members.**

The fundamental responsibility of members of the Company's Board of Directors is to promote the best interests of the Company and its stockholders by overseeing the management of the Company's business and affairs. In doing so, Board members have two basic legal obligations to the Company and its stockholders: (a) the duty of care, which generally requires that Board members exercise appropriate diligence in making decisions and in overseeing management of the Company, and (b) the duty of loyalty, which generally requires that Board members make decisions based on the best interests of the Company and its stockholders and without regard to any personal interest.

**Board Risk Oversight.**

The Board of Directors has ultimate responsibility for risk oversight. While management has day-to-day responsibility for assessing and managing the Company's risk exposure, the Board of Directors and its committees provide oversight in connection with those efforts, with particular focus on ensuring that the Company's risk management practices are adequate and regularly reviewing the most significant risks facing the Company. The Board of Directors has delegated to each of its committees responsibility for the oversight of specific risks that fall within the committee's areas of responsibility.

**Corporate Integrity and Compliance.**

The Board of Directors is responsible for monitoring the Company's compliance with legal and regulatory requirements and overseeing the Company's corporate integrity and compliance programs. The Board has delegated much of this responsibility to the Audit Committee. In furtherance of this responsibility, the Audit Committee will periodically discuss the implementation and effectiveness of the Company's corporate integrity and compliance programs with the Company's Executive Vice President, General Counsel and Secretary and Corporate Vice President and Global Chief Compliance & Governance Officer. In addition, the Audit Committee will periodically review the Company's Code of Business Conduct and Ethics, which sets forth the basic ethical principles all Board members, officers, employees and contractors must follow, and recommend any proposed changes to the Board of Directors for approval.

Employees, officers and directors must honestly and accurately report all business transactions. You are responsible for the material accuracy of your records and reports. Accurate record keeping and reporting are essential to the Company's ability to meet legal and regulatory obligations. All Company books, records and accounts shall be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record in all material respects. The financial statements of the Company shall conform in all material respects to generally accepted accounting principles and the Company's accounting policies. No undisclosed or unrecorded account or fund shall be

established for any purpose.  No false or misleading entries shall be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation.  It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the Securities and Exchange Commission and in all other public communications.

49.     In addition, the Company's Audit Committee is specifically tasked with the Board's oversight responsibilities.   The purpose of the Audit Committee is governed by the Audit Committee Charter, which states:

The purpose of the Audit Committee is to:

• Oversee the independent auditor's qualifications, independence and performance, and preapprove all audit and allowable non-audit services to be provided by the independent auditor;

• Assist Board oversight of (i) the integrity of the Company's financial statements and other financial information; (ii) the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting; (iii) the performance of the Company's internal auditors; and (iv) the Company's integrity and compliance programs, including compliance with legal and regulatory requirements; and

• Prepare the audit committee report required to be included in the Company's annual proxy statement.

50.     The Audit Committee Charter states the responsibilities of the Audit Committee members as follows:

Financial Reporting

10. Review and discuss with management and the independent auditor the Company's quarterly and annual financial reports, including management's discussion and analysis of financial condition and results of operations, any certification, report, opinion or review rendered by the independent auditor in connection with such reports and any communications required by professional standards between the independent auditor and the Committee prior to the public release of such information.

11. Recommend to the Board of Directors whether the audited annual financial statements should be included in the Company's Annual Report on Form 10-K.

12. Review and discuss with management and the independent auditor (i) significant accounting and financial reporting issues and judgments made in connection with the preparation of the Company's financial statements and other public reports, including the Company's selection and application of significant accounting principles; (ii) any major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (iii) the development, selection and disclosure of critical accounting policies and estimates; (iv) the effect of financial reporting and accounting initiatives and any related party or off-balance sheet transactions on the Company's financial statements; and (v) any analyses prepared by management or the independent auditor of the effect of alternative assumptions, estimates or GAAP methods on the Company's financial statements.

13. Review and discuss generally with management the types of information to be disclosed and the types of presentations to be made in the Company's earnings press releases and in any financial information and earnings guidance provided by the Company to analysts and rating agencies.

Internal Control Structure

14. Review, and discuss with management, the independent auditor and the Corporate Vice President - Internal Audit the adequacy and effectiveness of the Company's (i) financial reporting procedures and (ii) internal control structure, including its disclosure controls and procedures and internal control over financial reporting (including any material weaknesses, significant deficiencies or significant changes to internal controls).

15. Review and discuss with management, the independent auditor and the Corporate Vice President - Internal Audit the Company's annual internal control report and the independent auditor's attestation to such report.

16. Periodically receive reports from and consult with the Information Technology Oversight Committee of the Board of Directors regarding IT systems and processes that relate to or affect the Company's internal control systems.

Risk Assessment and Risk Management

17. Review and discuss with management and the Board of Directors (i) the guidelines and policies that govern the processes by which the Company assesses and manages its exposure to risk and (ii) the Company's major financial and other risk exposures and the steps management has taken to monitor and control such exposures.

Corporate Integrity and Compliance

18. Oversee and discuss with the Company's Executive Vice President, General Counsel and Secretary and its Corporate Vice President and Global Chief Compliance & Governance Officer the Company's compliance with legal and regulatory requirements and the implementation and effectiveness of the Company's corporate integrity and compliance programs, including the Company's Code of Business Conduct and Ethics. The Executive Vice President, General Counsel and Secretary and the Corporate Vice President and Global Chief Compliance & Governance Officer have authority to communicate directly with the committee.

19. Periodically review the Company's Code of Business Conduct and Ethics and recommend any proposed changes to the Board of Directors for approval.

20. Review and make recommendations to the Board of Directors regarding potential waivers of the Company's Code of Business Conduct and Ethics involving Board members or executive management.

21. Review and discuss with the Executive Vice President, General Counsel and Secretary, the Executive Vice President and Chief Financial Officer, other members of management, as appropriate, and the independent auditor any correspondence with, or other action by, regulators or governmental agencies and any employee complaints or published reports that raise material issues regarding the Company's financial statements or accounting policies.

22. Discuss with the Company's Executive Vice President, General Counsel and Secretary any legal matters that may have a material impact on the Company's financial statements, operations or reputation.

23. Review and discuss with the independent auditor any information obtained from the independent auditor with respect to illegal acts in accordance with Section 10A of the Securities Exchange Act of 1934, as amended.

24. Periodically review the Company's procedures for (i) the receipt, retention and treatment of complaints or concerns regarding financial fraud or accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by Company employees of complaints or concerns regarding financial fraud or questionable accounting or auditing matters.

51. In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, the Audit Committee Defendants conducted little, if any, oversight of the Company's internal controls over public disclosures resulting in materially false and misleading statements regarding the Company's business, operational and compliance policies, and

consciously disregarded their duties to monitor such controls over reporting. The Audit Committee Defendants' complete failure to perform their duties in good faith resulted in misrepresentations to the SEC, the investing public, and the Company's shareholders.

52.    Further, the Company's IT Oversight Committee is specifically tasked with the Board's oversight responsibilities regarding information technology issues. The purpose of the IT Oversight Committee is governed by the IT Oversight Committee Charter, which states:

> The purpose of the Information Technology Oversight Committee is to:
>
> • Review major information technology ("IT")-related projects and technology architecture decisions;
>
> • Assess whether the Company's IT programs effectively support the Company's business objectives and strategies;
>
> • Assist Board oversight of cybersecurity risks and management efforts to monitor and mitigate those risks;
>
> • Advise the Company's senior IT management team; and
>
> • Advise the Board of Directors on IT-related matters.

53.    The IT Oversight Committee Charter states the responsibilities of the IT Oversight Committee members as follows:

> *Cybersecurity*
>
> 4. Review and discuss with management and the Board of Directors (i) the Company's cybersecurity risks and (ii) the steps management has taken to identify, assess and monitor those risks.
>
> 5. Review and discuss with management (i) technologies, policies, processes and practices for managing and mitigating cybersecurity risks and (ii) the Company's cyber-attack incident response and recovery plan.
>
> *IT Disaster Recovery*
>
> 6. Review and discuss with management the Company's IT disaster recovery capabilities and contingency plans.

*Internal Controls*

7. Review and discuss with management the quality and effectiveness of IT systems and processes that relate to or affect the Company's internal control systems.

8. Review and discuss with management and the Board of Directors (i) the Company's IT-related compliance risks, including IT-related internal audits, and (ii) the steps management has taken to identify, assess, monitor, manage and mitigate those risks.

9. Periodically report to and consult with the Audit Committee of the Board of Directors regarding IT systems and processes that relate to or affect the Company's internal control systems.

*Advisory Role*

10. Advise the Company's senior IT management team.

11. Stay informed of, assess and advise the Company's senior IT management team with respect to new technologies, applications and systems that relate to or affect the Company's IT strategy or programs.

54.     In violation of the IT Oversight Committee Charter, and their general duties as members of the IT Oversight Committee, the IT Oversight Committee Defendants conducted little, if any, oversight of the Company's internal controls over the Company's IT matters, resulting in materially false and misleading statements regarding the Company's business, operational and compliance policies, and consciously disregarded their duties to monitor such controls.  The IT Oversight Committee Defendants' complete failure to perform their duties in good faith resulted in misrepresentations to the SEC, the investing public, and the Company's shareholders.

55.     In addition, as executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future

business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.  Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

56.     The Individual Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their own company's Code, Audit Committee Charter, and IT Oversight Committee Charter have inflicted, and will continue to inflict, significant harm on FedEx, as detailed herein.

## ADDITIONAL SUBSTANTIVE ALLEGATIONS

### Background of FedEx

57.     FedEx is a multinational courier delivery services company headquartered in Memphis, Tennessee.  The Company is known for its overnight shipping service and pioneering a system that could track packages and provide real-time updates on package location, a feature that has now been adopted by most other carrier services.

58.     FedEx provides a broad portfolio of transportation, e-commerce, and business services through companies competing collectively, operating independently, and managed collaboratively, under the respected FedEx brand.  These companies are broken into various business segments; FedEx Express, FedEx Ground, FedEx Freight, and FedEx Services, among others.  FedEx Express is the world's largest express transportation company, offering time-definite delivery to more than 220 countries and territories.

59.     FedEx Ground is a leading North American provider of small-package ground delivery services.  FedEx Freight is a leading North American provider of less-than-truckload freight services.     FedEx Services provides sales, marketing, information technology,

communication, customer service, technical support, billing and collection services, and certain back-offline functions that support FedEx's transportation segments.

***FedEx Acquires TNT for $4.8 Billion***

60.     Although FedEx's U.S. business is strong, accounting for 76% of the Company's revenues in FY2016 and commanding a substantial market share domestically, FedEx competes against UPS, DHL International GmbH ("DHL"), and other carriers internationally.

61.     To better compete internationally and boost its European presence, especially, FedEx announced on April 7, 2015 that it had entered into an agreement to acquire TNT, a Netherlands-based shipping company, for $4.8 billion.   The proposed acquisition would be FedEx's largest acquisition since the Company's inception.

62.     In a call with analysts held on the same day, the Company's executives touted the benefits of the proposed acquisition of TNT, including the synergies that would be generated from the Company's legacy operations in Europe and TNT's business.

63.     The acquisition of TNT closed on July 4, 2016, after receiving approvals from TNT's shareholders and multiple regulatory bodies.

64.     After the acquisition was completed, FedEx pushed onward to integrate its legacy European business with TNT's business.   During the integration process, on March 31, 2017, FedEx announced that TNT's financial results would be combined with its FedEx Express reporting segment, which would mean that public investors could no longer see TNT's operational results on a standalone basis.

65.     With the combined reporting in place, FedEx set the TNT Income Improvement Target, which would measure FedEx Express's operating income improvement over a three-year period attributable to the synergies created by acquiring TNT.   The TNT Income Improvement

Target was set between $4.0 billion and $4.3 billion in fiscal 2020 as compared to $2.8 billion in operating income in fiscal 2017.

66.     About a year after the TNT acquisition was completed, on June 27, 2017, various news outlets reported that TNT's computer systems were experiencing outages due to a potential cyberattack.  Later that day, FedEx confirmed that TNT was subject to cyberattacks.

67.     The next day, FedEx announced that TNT operations and communication networks had been disrupted by the cyberattacks, resulting in customer service delays.  FedEx also announced that it was quickly remediating the cyberattacks, but the resulting financial impact could be material.

68.     On June 28, 2019, it was reported that several other large organizations were breached from the Cyberattack, including Mondelez Internal Inc., DLA Piper, Maersk Line A/S, and BNP Paribas S.A.  The Cyberattack is considered one of the most devasting attacks in history with more than $10 billion in financial harm on the victims.

69.     As a result of the Cyberattack, TNT's operations were heavily affected.  TNT package deliveries to customers experienced significant delays and, worse, were lost throughout Europe.  Because of the deterioration of the services, a significant amount of TNT's customers permanently took their high-margin parcel business to UPS and DHL.  During the Relevant Period, unknown to investors, TNT was unable to recover the lost customers and their businesses.

***The Individual Defendants Cause FEDEX to Issue Materially False and Misleading Statements***

70.     Throughout the Relevant Period, FedEx's stock was artificially inflated due to the Individual Defendants' causing FedEx to issue materially false and misleading information.

71.     On September 19, 2017, FedEx reported its 1Q 2018 results, which missed analysts' estimates due to lost customer sales and remedial costs from the Cyberattack.

72.     To quell investors' concerns, the Individual Defendants highlighted its recovery efforts from the Cyberattack and dismissed investors' concerns about the impact the Cyberattack had on FedEx's business.

73.     On an earnings call held on September 19, 2017, the Company's executives assured investors that all critical TNT systems were fully restored to pre-Cyberattack levels and the remaining repairs would be completed by the end of September 2017.  During the call, Defendant Bronczek stated:

> Given the discussion around the impact of the cyberattack on TNT, I thought it [was] very important to point out the underlying fundamentals of the FedEx Express business remain very strong.
>
> In particular, International Export Package revenue for the segment grew 4% in the quarter after absorbing the impact of the cyberattack.  And we have made significant progress on the recovery of the TNT business and IT systems.
>
> *        *        *
>
> From a customer perspective, our teams are executing a detailed, thorough, and customer-focused plan, targeting and restoring customer volumes to our expected levels.  This plan includes leveraging our senior officer team on sales calls to instill confidence with customers so that we can fully meet their expectations…
>
> **Our service levels within Europe have been restored to pre-crisis levels.**  And in August, this past month of 2017, our service levels were actually above those a year ago in August of 2016.  Tremendous work by the operations team.  With strong service levels and operations returning to near-normal capabilities, our focus now shifts to finalizing the restoration of certain key customer-specific solutions and their systems.  **We expect these IT capabilities to be restored by the end of this month, enabling business-as-usual operations with full capabilities across all customer segments just in time for peak shipping.**

(emphasis added).

74.     Misled by the Company's representations, analysts released positive views of the Company.  For example, Oppenheimer maintained an "Outperform" rating and its $229.00 target on the Company's stock based on supposed recovery of TNT systems and the TNT Income

Improvement Target.  Deutsche Bank also maintained its "Buy" rating and $235.00 price target on the Company's stock based on the unchanged TNT Income Improvement Target.

75.     On this news, the Company's stock increased 2.1% to $216.95 per share on September 20, 2017.

76.     The Individual Defendants continued to cause the Company to issue a materially false and misleading information.  On December 19, 2017, announcing its 2Q 2018 results in an earnings call, defendant Smith touted TNT's successful recovery from the Cyberattack, and stated:

> **We're very proud of the progress the FedEx team has made in recovering from the effects of the cyberattack at TNT.**  Let me express our appreciation to the thousands of FedEx professionals who worked around the clock and tirelessly to mitigate this unprecedented event.  Dave will update you in his discussion of overall global operations.  We expect yield and volume growth at all of our transportation segments will support revenue and earnings growth in the second half of fiscal 2018.  **Our plans remain on target to improve operating income at the FedEx Express segment by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017** and our goal remains to increase earnings, margins, cash flows and returns and we are confident that we can do so.

(emphases added).

77.     On the same call, defendant Graf also reaffirmed the TNT Income Improvement Target based on the supposed increased internal volumes despite the Cyberattack, stating:

> **Despite the challenges from the cyberattack, total international average package volume increased 5% . . . We remain committed to our target of $1.2 billion to $1.5 billion in additional operating profit for the FedEx segment in FY 2020 versus FY 2017**, which includes TNT synergies as well as base business and other operational improvements across the entire global FedEx Express network.

(emphasis added).

78.     Defendant Bronczek echoed the other defendants and confirmed that TNT's service levels and operations were "back to normal," and that TNT's volumes and cost efficiencies were improving, stating:

First, let me start off with FedEx Express. They grew their revenues and profits, as Alan just mentioned, despite the impact of the TNT Express cyberattack. **The underlying fundamentals of the business remain very strong with higher base rates and growth in the international package and freight services. Cost efficiencies are also improving.** For example, we continue to see higher aircraft fleet reliability, which increases our productivity. **I'm also very happy to say that at TNT, we are seeing strong service levels and operations are back to normal after the June cyberattack.**

(emphases added).

79.     On this news, FedEx stock increased 3.5% to $251.07 per share on December 20, 2017.

80.     On March 20, 2018, the Company issued 3Q 2018 results. In the 3Q 2018 earnings call, defendant Graf, regarding the Company's financials, stated:

As [defendant Smith] mentioned, **we remain committed to our target of $1.2 billion to $1.5 billion in additional operating profit for the FedEx Express segment in FY 2020 versus FY 2017**, which includes TNT synergies as well as base business and other operational improvements across the global FedEx Express network.

(emphasis added).

81.     On the same call, defendant Bronczek touted the post-Cyberattack restoration of TNT's services and the TNT integration results, stating:

I also want to provide an update on our TNT integration. As you know, this was the most significant acquisition in our company's history, and dramatically improves our global capabilities and competitive posture. **I'm happy to say that, at TNT, we are seeing strong service levels, and the integration is accelerating. A key element of our acceleration plan was to enable the flow of packages between the legacy TNT and FedEx systems prior to full integration.** This allows us to direct volumes to the highest

> service, but the lowest cost networks. This capability is expected to
> be in place by May 31 of this year.

(emphasis added).

82.    Addressing analysts' questions, defendant Smith stated on the same call that TNT

volumes were back to pre-Cyberattack levels:

> The second is from Jack Atkins of Stephens.  To what degree was the June
> cyberattack at TNT negatively impact 3Q results, I guess, it did negatively impact
> 3Q results at Express, and would you expect any lingering impact in the fourth
> quarter?  Now, I think these questions from Todd and Jack, and I'm going to ask
> again Dave and David Cunningham to amplify this, reflects a bit of a
> misunderstanding here, in that, please recall that when we started this fiscal year,
> we told you that we were no longer going to be talking about Express and TNT.
>
> So the numbers that are in the Express segment now are the combination of the two.
> So the reality is, the FedEx Express volumes are growing, **but the TNT volumes
> were adversely affected by Not Petya and we are now going back up to where
> we would have been had this attack not happened.**  And let me again give
> enormous thanks to our sales, our customer service and particularly our IT
> professionals that did the most unbelievable job of recovering from this attack,
> which the U.S. government now says was a government or a government-
> sanctioned attack on the Ukraine, and TNT was just a side victim of it.
>
> So the fourth quarter will - I think, began to show these at a more granular fashion.
> **But we're not seeing decline in Express traffic, in the fourth quarter we will
> have recovered most of the NotPetya volume from TNT now.**

(emphases added).

83. Defendant Cunningham echoed defendant Smith's remarks, stating:

> Yeah, I'd just add a couple of comments to what Fred and Dave just said. I think,
> first thing you got to remember is the effects in Q3 were mostly one-off type of
> effects.  Q4 ends up being a seasonally strong quarter and we've already told you
> what that's going to be.  Our TNT network was fully restored and back to business
> as usual as of the end of 2017.  **The recovery of the business over the last five
> months has been remarkable.  And given the value proposition of the TNT
> road networks, our freight volumes have been strong, and we are experiencing
> solid growth in these products.**  The cyberattack continues to have a lingering
> effect in the third quarter, and our existing customer base has not been fully restored
> - has not fully restored all volumes as they continue to gain confidence in our ability
> to provide service and recovery of our business.  Our outstanding performance
> during peak is evidence of the strength of our network and our recovery and our

sales teams are leveraging this in the fourth quarter, and growing and winning business.

(emphasis added).

84.     The above statements referenced in ¶¶ 71-82 were materially false and misleading as the statements failed to disclose and/or misrepresented the following adverse facts which were known to the Individual Defendants or recklessly disregarded by them:  (1) TNT's overall package volume growth was slowing as TNT's large customers permanently took their business to competitors after the Cyberattack; (2) as a result of the customer attrition, TNT was experiencing an increased shift in product mix from higher-margin parcel services to lower-margin freight services; (3) the anticipated costs and timeframe to integrate and restore the TNT network were significantly larger and longer than disclosed; (4) FedEx was not on track to achieve the TNT Income Improvement Target; and (5) as a result of these undisclosed negative trends and cost issues, FedEx's positive statements about TNT's recovery from the Cyberattack, integration into FedEx's legacy operations, customer mix, customer service levels, profitability, and prospects lacked a reasonable basis.

**THE TRUTH IS REVEALED**

85.     On December 7, 2018, the Company abruptly announced that defendant Cunningham, FedEx Express's CEO, was to retire at the end of the month.  Analysts immediately suggested that Cunningham was being pushed out due to the performance issues within the FedEx Express segment of the Company.

86.     On this news, FedEx stock dropped 6.4% to $201.39 per share on December 7, 2018.

87.     On December 18, 2018, the Company issued its 2Q 2019 results.  In the disclosure, FedEx lowered its fiscal 2019 outlook and told investors that the TNT Income Improvement Target

would likely not be met by the end of fiscal 2020. On the 2Q 2019 earnings call, defendant Bronczek explained that "[following TNT's recovery from the cyberattack, [FedEx has] seen an accelerated shift of [its] product mix to more freight than parcel, putting pressure on [FedEx's] system and of course [FedEx's] costs."

88.     On the same call, defendant Graf touched on the integration of TNT's business with FedEx's legacy European business, stating that the integration of TNT was not progressing at the previously touted pace due to, in part, "a change in service mix following the NotPetya cyberattack. As to the TNT Income Improvement Target, defendant Graf stated:

> The timing and amount of integration expenses and capital investments in any future period may change as we continue to execute the integration of TNT. We expect to realize the benefits of the TNT acquisition that were anticipated when the company was acquired, **although at a more moderate pace caused by reductions in base business levels due to increasing economic weakness during the second quarter and a change in service mix following the NotPetya cyber attack. As a result, we now expect the operating profit improvement goal of $1.2 billion to $1.5 billion for Express over fiscal year '17 will not be realized in FY '20.**

(emphasis added).

89.     Responding to analysts' questions regarding TNT, defendant Bronczek revealed that TNT's high margin parcel business had failed to grow at the previous expected rate, stating:

> There is no question about the fact that I mentioned -- made in my comments that one of the things that TNT really did very well, and we continue to do well with TNT inside FedEx, is the freight product and their specialty freight product. So after the cyberattack that product came booming back because no one is better than we are in that product. So that product, of course, has a little bit different mix, a little bit different cost structure to it. **We're focusing on our parcels as well. As you pointed out, the questioner pointed out, our volumes are growing, they're just not growing as fast as what we would like them to grow.**

(emphasis added).

90.     On this news, FedEx stock dropped 12.2% to $162.51 per share on December 19, 2018.

91.     Analysts quickly responded to the disappointing revelations and slashed their price targets.  Based on the disclosure of the TNT integration and post-Cyberattack remedial measures, some analysts questioned whether Company executives intentionally misled the investing public by maintaining the TNT Income Improvement Target.

92.     On December 19, 2018 Barclays issued a report lowering FedEx's price target, stating:

> Despite nearly a year of lagging Express segment results following the complete operational shutdown of TNT from a computer virus (missed our margin expectations 4 out of the last 5 quarters), FedEx management until today clearly articulated to the investor community that: 1) TNT was fully operational following the cyberattack; and 2) aggressive profit improvement plans were "confidently" on track. . . . **While we think Express results following the cyberattack clearly indicated mix recovery challenges in the TNT business, management chose to maintain guidance until today's cut.**  Perhaps this analyst will be less trusting of management commentary going forward.

(emphasis added).

93.     Deutsche Bank echoed Barclays' frustrations of FedEx's executives explanations regarding the TNT integration and post-Cyberattack remedial measures, stating:

> The commentary around Europe is not very satisfying, as it likely reflects significant underperformance at TNT, on which Mgmt. is still not offering necessary details (we believe TNT volumes are more heavily skewed towards larger, palletized freight, as opposed to parcel, making the read-through to other global package delivery companies less meaningful, in our view).

**THE DIRECTOR DEFENDANTS ISSUED A MATERIALLY FALSE AND MISLEADING PROXY STATEMENT DURING THE RELEVANT PERIOD**

94.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Director Defendants also caused the Company to issue a false and misleading proxy statement during the Relevant Period.  Specifically, the Company's 2018 Proxy sought stockholder votes to, among other things, re-elect all of the Director Defendants to serve on the Board for fiscal 2019 and approve executive office compensation.

95.     The Director Defendants drafted, approved, reviewed, and/or signed the 2018 Proxy before it was filed with the SEC and disseminated to FedEx's shareholders.  The Director Defendants negligently issued materially misleading statements in the 2018 Proxy.  These 2018 Proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants, and they do not allege or do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the 2018 Proxy allegations and related claims.

96.     In support of re-electing themselves, the Director Defendants highlighted their supposed oversight of the Company.  In particular, the 2018 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that FedEx faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.  The 2018 Proxy stated:

**Board Risk Oversight**

The Board of Directors' role in risk oversight at FedEx is consistent with the company's leadership structure, with management having day-to-day responsibility for assessing and managing the company's risk exposure and the Board and its committees providing oversight in connection with those efforts, with particular focus on ensuring that FedEx's risk management practices are adequate and regularly reviewing the most significant risks facing the company.  The Board performs its risk oversight role by using several different levels of review.  Each Board meeting begins with a strategic overview by the Chairman of the Board and Chief Executive Officer that describes the most significant issues, including risks, affecting the company, and also includes business updates from the President and Chief Operating Officer and each reporting segment CEO.  In addition, at least annually, the Board reviews in detail the business and operations of each of the company's reporting segments, including the primary risks associated with that segment.  The Board also reviews the risks associated with the company's financial forecasts and annual business plan.

Additionally, risks are identified and managed in connection with the company's robust enterprise risk management ("ERM") process.  Our ERM process provides

the enterprise with a common framework and terminology to ensure consistency in identification, reporting and management of key risks. The ERM process is embedded in our strategic financial planning process, which ensures explicit consideration of risks that affect the underlying assumptions of strategic plans and provides a platform to facilitate integration of risk information in business decision-making.

The Board has delegated to each of its committees responsibility for the oversight of specific risks that fall within the committee's areas of responsibility.

THE AUDIT COMMITTEE reviews and discusses with management the company's major financial and other risk exposures and the steps management has taken to monitor and control such exposures and the implementation and effectiveness of the company's compliance and ethics programs, including the Code of Business Conduct and Ethics and the employee hotline program. In addition, the Audit Committee is responsible for reviewing and discussing with management the guidelines and policies that govern the processes by which the company assesses and manages its exposure to all risk, including our ERM process. The ERM process culminates in an annual presentation to the Audit Committee on the key enterprise risks facing FedEx.

THE INFORMATION TECHNOLOGY OVERSIGHT COMMITTEE reviews and discusses with management the company's cybersecurity risks and the technologies, policies, processes and practices for managing and mitigating such risks, and it reviews and discusses with management the quality and effectiveness of the company's information technology systems and processes, including the extent to which those systems and processes protect the company from technology-related risks.

97.     The 2018 Proxy thus assured stockholders that the Director Defendants were involved with FedEx's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices, and acting in an ethical and legal manner. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Individual Defendants from causing the Company to make materially false and misleading statements and omissions about: (i) TNT's overall package volume growth was slowing as TNT's large customers permanently took their business to competitors after the Cyberattack; (ii) as a result of the customer attrition, TNT was experiencing an increased shift in

product mix from higher-margin parcel services to lower-margin freight services; (iii) the anticipated costs and timeframe to integrate and restore the TNT network were significantly larger and longer than disclosed; (iv) FedEx was not on track to achieve the TNT Income Improvement Target; and (v) as a result of the undisclosed negative trends and cost issues, FedEx's positive statements about TNT's recovery from the Cyberattack, integration into FedEx's legacy operations, customer mix, customer service levels, profitability, and prospects lacked a reasonable basis. The securities class action seeks tens of millions of dollars in damages.

98.     As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

## DAMAGES TO FEDEX

99.     As a result of the Individual Defendants' wrongful conduct, FedEx disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated FedEx's credibility. FedEx has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

100.    Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected FedEx to the Securities Actions. As a direct and proximate result of the Individual Defendants' actions, FedEx stands to expend millions of dollars in legal fees and payments, in addition to the excessive compensation and benefits that were paid to the Individual Defendants while they were breaching their fiduciary duties to the Company. Specifically, as a result of the Individual Defendants' breaches, FedEx has incurred significant expenses, including, *inter alia*:

a.      unwarranted distribution of executive compensation and severance payments;

b. increased costs resulting from the loss of market capitalization and the Company's damaged reputation in the investment community;

c. substantial costs to carry out internal investigations, including legal fees paid to outside counsel; and

d. potential damages related to litigation and/or SEC fines resulting from improperly-reported, overstated profits.

101. Moreover, these actions have irreparably damaged FedEx's corporate image and goodwill. For at least the foreseeable future, FedEx will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that FedEx's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DERIVATIVE AND DEMAND ALLEGATIONS

102. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103. Plaintiff brings this action derivatively in the right and for the benefit of the company to redress the Individual Defendants' breaches of fiduciary duties.

104. Plaintiff is an owner of FedEx common stock and was an owner of FedEx common stock at all times relevant hereto.

105. Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

106. As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

107.    At the time of filing, the Board is comprised of the Director Defendants.

108.    All of the Individual Defendants have interpersonal or business connections that render them incapable of independently or fairly considering the claims alleged herein.

**Demand is Futile as to the Director Defendants Because They Face a Substantial Likelihood of Liability**

109.    The Director Defendants face a substantial likelihood of liability for their individual misconduct.

110.    As alleged above, the Director Defendants breached their fiduciary duties by negligently issuing the materially false and misleading 2018 Proxy soliciting the re-election of themselves to the Board.  Accordingly, the Director Defendants face a substantial likelihood of negligence liability for issuing the 2018 Proxy and any demand upon these defendants is therefore futile.

111.    Further, the Director Defendants were directors throughout the time of the false and misleading statements referenced above, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

112.    Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of FedEx.

113.     The Director Defendants' making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties have resulted in the Individual Defendants facing a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of FedEx to recover damages sustained as a result of this misconduct, they would expose themselves and their colleagues to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Director Defendants.

**Demand is excused as to the defendants Edwardson, Jackson, Smith, Steiner, and Walsh.**

114.     As alleged above, the Insider Selling Defendants sold FedEx stock under highly suspicious circumstances.  Defendants Edwardson, Jackson, Smith, Steiner, and Walsh possessed material, nonpublic company information and used that information to benefit themselves.  Defendants Edwardson, Jackson, Smith, Steiner, and Walsh sold stock based on this knowledge of material, nonpublic company information about the Company's woefully inaccurate financial statements, inadequate internal controls, and the impending decrease in the value of their holdings of FedEx.  Accordingly, defendants Edwardson, Jackson, Smith, Steiner, and Walsh face a substantial liability for breach of their fiduciary duties of loyalty.  Any demand upon Defendants Edwardson, Jackson, Smith, Steiner, and Walsh is futile.

**Demand is excused as to the Audit Committee Defendants.**

115.     The Audit Committee Defendants, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter

provides that it is responsible for the "oversight of (i) the integrity of the Company's financial statements and other financial information; (ii) the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting; (iii) the performance of the Company's internal auditors; and (iv) the Company's integrity and compliance programs, including compliance with legal and regulatory requirements[.]"

116.    Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Through their knowledge or reckless disregard, the Audit Committee Defendants caused improper statements made by the Company.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of duties, so any demand upon them is futile.

**Demand is excused as to the IT Oversight Committee Defendants.**

117.    The IT Oversight Committee Defendants, as members of the IT Oversight Committee, recklessly authorized FedEx to issue false and misleading statements, and failed to timely correct such statements.  The IT Oversight Committee Charter provides that the IT Oversight Committee Defendants are responsible for "assess[ing] whether the Company's IT programs effectively support the Company's business objectives and strategies."  Further, the IT Oversight Committee Defendants are responsible for "assist[ing] Board oversight of cybersecurity risks and management efforts to monitor and mitigate those risks."

118.    Thus, the IT Oversight Committee Defendants were responsible for ensuring that the Company not make misleading statements regarding the Cyberattack and its impact on the Company's business.  Through their knowledge or reckless disregard, the IT Oversight Committee

Defendants caused the improper statements made by the Company.  Accordingly, the IT Oversight Committee Defendants breached their fiduciary duties of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, the IT Oversight Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties, so any demand upon them is futile.

**Demand is excused as to defendant Smith.**

119.    Defendant Smith faces a substantial likelihood of liability for violations of federal securities laws, as indicated by the Securities Actions.  Further, Defendant Smith, as an officer and a director of FedEx, derives substantially all of his income from FedEx, making him not independent.  As such, defendant Smith cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Additional Demand Futility Allegations**

120.    If FedEx's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their own protection with corporate funds, *i.e.*, monies belonging to the stockholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by FedEx against the Individual Defendants, known as the "insured versus insured exclusion."

121.    As a result, if the Individual Defendants were to sue themselves or certain of the officers of FedEx, there would be no D&O Insurance protection.  This is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate

recovery.  Therefore, the Individual Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.  Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting FedEx by prosecuting this action.

122.    The Board has proven time and time again that it is incapable of exercising independent judgment in deciding whether to investigate or bring actions that involve its individual members.  There is no reason to believe that this action would be any different.  Each of the Individual Defendants either participated directly in the wrongdoing alleged or are inextricably linked to defendants who so participated.  For all of the aforementioned reasons, demand on the Board is futile and thus excused.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS FOR
### BREACH OF FIDUCIARY DUTY

123.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

124.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of FedEx's business and affairs.

125.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

126.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of FedEx.

127. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

128. In addition, the Individual Defendants further breached their fiduciary duties owed to FedEx by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that (i) TNT's overall package volume growth was slowing as TNT's large customers permanently took their business to competitors after the Cyberattack; (ii) as a result of the customer attrition, TNT was experiencing an increased shift in product mix from higher-margin parcel services to lower-margin freight services; (iii) the anticipated costs and timeframe to integrate and restore the TNT network were significantly larger and longer than disclosed; (iv) FedEx was not on track to achieve the TNT Income Improvement Target; and (v) as a result of the undisclosed negative trends and cost issues, FedEx's positive statements about TNT's recovery from the Cyberattack, integration into FedEx's legacy operations, customer mix, customer service levels, profitability, and prospects lacked a reasonable basis. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

129. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

130. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed

knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

131.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

132.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, FedEx has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

133.    Plaintiff on behalf of FedEx has no adequate remedy at law.

## COUNT II

## AGAINST THE DIRECTOR DEFENDANTS FOR
## VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT

134.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

136.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2018 Proxy.  In the 2018 Proxy, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

137.    The 2018 Proxy, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls which facilitated the illegal behavior

described herein.   By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, FedEx misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

138.    Plaintiff, on behalf of FedEx, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2018 Proxy in connection with the improper reelection of the Director Defendants to the Board.

## COUNT III

### AGAINST THE INSIDER SELLING DEFENDANTS FOR
### INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION

139.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.    At the time each of the Insider Selling Defendants sold his or her FedEx stock, he or she knew the material, non-public information described above, and sold FedEx stock on the basis of such information.

141.    The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects.  It was a proprietary asset belonging to the Company, which each of the Insider Selling Defendants misappropriated to his or her own benefit when he or she sold personal holdings in FedEx stock. Each of the Insider Selling Defendants knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of FedEx stock.

142.    The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith.  Each of the Insider Selling Defendants is therefore liable to FedEx for insider trading.

143.   Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Selling Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Selling Defendants obtained thereby.

144.   Plaintiff, on behalf of FedEx, has no adequate remedy at law.

**COUNT IV**

**AGAINST THE INDIVIDUAL DEFENDANTS FOR
WASTE OF CORPORATE ASSETS**

145.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146.   As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Class Action that they brought on with their improper statements.  In addition, due to the Individual Defendants' mismanagement, the Company has been forced to interrupt its business and dedicate its resources and attention to restating and revisiting its past financial statements.

147.   As a result of the decision to allow the Company to operate in an environment devoid of adequate internal and financial controls, the Individual Defendants have caused FedEx to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

148.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

149.   Plaintiff, on behalf of FedEx, has no adequate remedy at law.

**COUNT V**

**AGAINST DEFENDANTS THE OFFICER DEFENDANTS AND THE INSIDER
SELLING DEFENDANTS FOR UNJUST ENRICHMENT**

150.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.   By their wrongful acts and omissions, the Officer Defendants were unjustly enriched at the expense of and to the detriment of FedEx.  The Officer Defendants were unjustly enriched as a result of the compensation they received while breaching fiduciary duties owed to FedEx.

152.   Additionally, the Insider Selling Defendants sold FedEx stock while in possession of material, nonpublic information that artificially inflated the price of FedEx stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

153.   Plaintiff, as a stockholder and representative of FedEx, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

154.   Plaintiff, on behalf of FedEx, has no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Declaring that Plaintiff may maintain this derivative action on behalf of FedEx and that Plaintiff is a proper and adequate representative of the Company;

B.   Awarding money damages against all defendants, jointly and severally, for the losses and damages suffered as a result of the acts and transactions complained of herein;

C.   Directing all defendants to disgorge all profits obtained from their wrongful conduct and breaches of fiduciary duties, including all severance payments and payments of cash bonuses;

D.   Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

E.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses;

F.     Awarding pre-judgment and post-judgement interest against the Individual Defendants at the highest rates permissible at law or in equity; and

G.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  September 17, 2019                    Respectfully Submitted,

                                              **COOCH AND TAYLOR, P.A.**

                                              */s/ Blake A. Bennett*
                                              Blake A. Bennett (#5133)
                                              The Nemours Building
                                              1007 N. Orange Street, Suite 1120
                                              Wilmington, DE 19801
                                              Telephone: (302) 984-3800
                                              Email: bbennett@coochtaylor.com

                                              *Attorney for Plaintiff*

**OF COUNSEL**

**BRAGAR EAGEL & SQUIRE, P.C.**
W. Scott Holleman
Marion C. Passmore
Garam Choe
Alexandra B. Raymond
885 3rd Avenue, Suite 3040
New York, New York 10022
Telephone: (212) 355- 4648

*Attorney for Plaintiff*