**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE FEDEX CORPORATION DERIVATIVE LITIGATION | ) ) ) ) ) ) ) | No. 19-cv-1747 <br><br> **JURY TRIAL DEMANDED** |

**CONSOLIDATED AMENDED DERIVATIVE COMPLAINT**

Plaintiffs Jason Flaker ("Flaker") and Darryl Payton ("Payton," and together with Flaker, "Plaintiffs"), by and through their undersigned attorneys, hereby submit this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant FedEx Corporation ("FedEx" or the "Company") against certain present and former members of its Board of Directors (the "Board"), and officers seeking to remedy their breaches of fiduciary duties, unjust enrichment and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiffs make these allegations upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by FedEx with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by FedEx; (c) review of news articles, concerning the underlying issues; (d) review of the pleadings in *Rhode Island Laborers' Pension Fund v. FedEx Corporation,* 19-cv-05990 (S.D.N.Y.) and *Selwyn Karp v. FedEx Corporation*, 19-cv-06183 (S.D.N.Y.); and (e) review of other publicly available information concerning FedEx and the defendants.

**NATURE OF THE ACTION**

1.     This action arises from damage the Individual Defendants caused FedEx (both economically and reputationally) through their issuance of material misrepresentations concerning a

global cyberattack known as a NotPetya virus ("NotPetya") and its lasting impact on FedEx's operations. As is now known, the NotPetya virus devastated FedEx operations in Europe, destroying significant portions of the Company's computer systems, crippling critical operations, and causing a massive loss of business. Defendants concealed and misrepresented these facts thereby exposing it to even further harm. Indeed, within months of NotPetya, Defendants began to claim falsely that the Company had fully recovered, that its operations were functioning normally, and that it remained on track to expand its business significantly in Europe.  This was not true.  Accordingly, in addition to NotPeyta harming the Company, the Individual Defendants' effort to hide the scope of the crisis further harmed the Company by exposing it to securities litigation liability and reputational damage.

2.      Accordingly, this stockholder derivative action arises from the Individual Defendants' breaches of fiduciary duties owed to the Company, as well as their complicity in constructive fraud, corporate waste, unjust enrichment, and violations of the Securities Exchange Act of 1934, from September 19, 2017 through December 18, 2018 (the "Relevant Period").

3.      According to its public filings, FedEx is the parent holding company through which a broad portfolio of transportation, e-commerce and business services are provided through companies competing collectively, operating independently and managed collaboratively, under the respected FedEx brand. These companies include FedEx Ground Package System, Inc. ("FedEx Ground"), and Federal Express Corp. ("FedEx Express").[1]

4.      FedEx provides customer and businesses worldwide with a broad portfolio of transportation, e-commerce, and business services. Since its inception, FedEx generated most of its revenues in the United States. In its 2016 fiscal year, for instance, FedEx generated 76% of its revenue from its U.S. operations and although FedEx generated a significant amount of revenue

---

[1] For purposes of this Complaint, FedEx and its subsidiaries (including "FedEx Ground" and "FedEx Express") will sometimes collectively be referred to simply as "FedEx."

internationally, the Company lagged its competitors, especially in Europe, and wanted to increase its market share.

5.      On April 7, 2015, FedEx announced that it had reached an agreement to acquire Netherlands-based TNT Express N.V. ("TNT"), one of the world's largest express delivery companies, for $4.8 billion in cash. FedEx completed the acquisition on May 25, 2016. To date, the acquisition of TNT has been FedEx's largest ever acquisition, and it raised the Company's international revenues as a percentage of FedEx's total revenues from 24% in FY 2016 to 33% in FY 2017.

6.      After the acquisition closed, FedEx embarked on an aggressive strategy to integrate its legacy European operations with TNT. On March 31, 2017, nine months after completing the acquisition, FedEx issued a three-year operating income improvement target for investors to gauge and track the purported benefits of the TNT acquisition and FedEx's integration efforts. Specifically, the Company stated that, in fiscal year 2020, its integration with TNT would result in a $1.2 billion to $1.5 billion operating income improvement above its fiscal year 2017 reported operating income (the "TNT Income Improvement Target").

7.      On June 27, 2017, TNT (now a subsidiary of FedEx) fell victim to NotPetya, which spread a malware virus throughout its target's computer systems (the "Cyberattack"). The Cyberattack is considered one of the largest cyberattacks in history, causing more than $10 billion in harm to its victims. As a result of the Cyberattack, which was announced in a press release on June 28, 2017, TNT's operations were severely impacted during the critical period of the integration process into FedEx's legacy European operations.

8.      NotPetya is a computer virus that disables infected computer systems permanently and can spread rapidly, infecting and disabling multiple computers throughout a network. Russian

military hackers planted NotPetya in Ukrainian computer systems and the virus spread throughout Europe and beyond in late-June 2017 before the outbreak was stopped.

9.      As investors learned only much later, NotPetya wreaked havoc on TNT's systems, disrupting the integration of TNT, delaying its progress, and hindering the Company's international revenue growth.

10.      On September 19, 2017, FedEx reported that the Cyberattack had negatively impacted its first quarter 2018 results (ended August 30, 2017). During the related earnings call, however, Defendants assured investors that *all critical* TNT systems were fully restored and fixes to its customer-specific systems were expected to be finalized by the end of September 2017. Company executives also reaffirmed the TNT Income Improvement Target.

11.      The result of this misrepresentation is that analysts maintained their ratings and price targets on FedEx stock due to the Company's assurances about its recovery from the Cyberattack. Indeed, on this news, FedEx stock increased $4.50 per share, or roughly 2.1%, to close at $220.50 per share on September 20, 2017.

12.      Following the September 19, 2017 report, Individual Defendants continually assured investors about its recovery from the Cyberattack and that any negative impact from the attack was minimal. For example, Individual Defendants told investors that TNT customer volumes were being restored to pre-attack levels and that "despite the cyberattack, the customers stuck with us." Individual Defendants also stated that TNT integration efforts were successfully progressing and continuously stated that FedEx was "on track" to achieve the TNT Income Improvement Target.

13.      Individual Defendants, however, were concealing the true impact of NotPetya, repeatedly telling investors that NotPetya was under control, that its impact had been managed, that the TNT integration remained on track, and that the Company remained set to reap the benefits of the TNT integration. Within months of the NotPetya outbreak, Individual Defendants announced that

"substantially all TNT Express critical operational systems have been restored" and expressly reaffirmed the income targets for the TNT integration. Individual Defendants repeated and reiterated similar false reassurances during the Relevant Period, meaning investors were given false representations that TNT's systems had been "fully restored," that the progress of the integration was actually "accelerated in light of the June 2017 cyberattack at TNT Express," and that the Company was "on track" to meet its integration goals. Individual Defendants specifically reaffirmed the Company's $1.2 to $1.5 billion TNT Income Improvement Target more than a dozen times during the Relevant Period. These and other statements detailed herein hid the true extent of harm caused by NotPetya and materially misrepresented its impact on the TNT integration.

14.     Investors did not learn the truth about NotPetya's impact on the Company until a series of corrective disclosures issued between June and December 2018. These disclosures caused collective market capitalization losses of nearly $15 billion. Specifically, in June and September of that year, FedEx announced a significant increase in the Company's ongoing integration costs and an unfavorable turn in its "service mix" – a euphemism for losing high-margin business because customers fled to competitors as FedEx's European operations floundered in NotPetya's aftermath.

15.     In early December 2018, FedEx announced the sudden "separation agreement" (i.e., the firing) of Defendant David L. Cunningham – the chief executive officer of the relevant business segment.

16.     A few days later, on December 18, 2018, FedEx finally admitted that, despite Individual Defendants' extensive reassurances, the Company would not achieve the $1.2 to $1.5 billion TNT Income Improvement Target – due, at least in part, to the NotPetya attack a year and a half earlier.

17.     These revelations shocked investors and analysts alike. As one analyst put it: "FedEx management until today clearly articulated to the investor community that: 1) TNT was fully

operational following the cyberattack; and 2) aggressive profit improvement plans were 'confidently' on track[.] Perhaps this analyst will be less trusting of management commentary going forward." This lawsuit seeks compensation for the damage caused to the Company by the material misrepresentations and omissions discussed herein.

## JURISDICTION

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because one of Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     This Court has personal jurisdiction over each defendant because they have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over nominal defendant FedEx because it is authorized to do business in this state, has consented to service in this state, and is incorporated within this District.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (i) a substantial portion of the transactions and wrongs complained of herein occurred in this District and (ii) Defendants have received substantial compensation and other transfers of money in the District by doing business and engaging in activities having an effect in this District.

**PARTIES**

22.     Plaintiffs have continuously been stockholders of FedEx during the wrongdoing complained of herein.

23.     Nominal Defendant FedEx was incorporated in Delaware on October 2, 1997 to serve as the parent holding company and provide strategic direction to the FedEx portfolio of companies. FedEx is headquartered in Memphis, Tennessee. FedEx's common stock is listed on the New York Stock Exchange under the symbol "FDX."

24.     Defendant David Bronczek ("Bronczek"), was at all relevant times the Company's Chief Operating Officer ("COO") and President.  While the Company's stock price was artificially inflated, Bronczek, on January 2, 2018 sold 46,555 shares of FedEx common stock at a price of $225.50 per share and received proceeds of $11,894,261. At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

25.     Defendant David L. Cunningham ("Cunningham"), was at all relevant times President and CEO of FedEx Express. Defendant Cunningham retired from the Company in December 2018 and is named as a defendant in the Securities Action.

26.     Defendant Donald F. Colleran ("Colleran"), was at all relevant times the Company's Chief Sales Officer and Executive Vice President. While the Company's stock price was artificially inflated, Colleran, on September 21, 2017, sold 10,000 shares of FedEx common stock at a price of $220 per share and received proceeds of $2,200,002. At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at

7

artificially-inflated prices at the time of his stock sale. Defendant Colleran is named as a defendant in the Securities Action.

27.     Defendant John A. Edwardson ("Edwardson"), has served as a director of the Company since 2003. Additionally, defendant Edwardson served as the Chair of the Board's Audit Committee (the "Audit Committee") during the Relevant Period. While the Company's stock price was artificially inflated, Edwardson, on September 19, 2018, sold 1,160 shares of FedEx common stock at a price of $242.30 per share and received proceeds of $281,124. At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

28.     Defendant Marvin R. Ellison ("Ellison"), has served as a director of the Company since 2014. In addition, defendant Ellison also served as a member of the Board's Compensation Committee (the "Compensation Committee"), the Information Technology Oversight Committee (the "IT Oversight Committee"), and the Governance Committee during the Relevant Period.

29.     Defendant Susan Griffith ("Griffith") has served as a director of the Company since March 2018. Additionally, Griffith served as a member of the IT Oversight Committee during the Relevant Period.

30.     Defendant Alan B. Graf Jr. ("Graf"), has served as the Company's Chief Financial Officer since 1998. While the Company's stock price was artificially inflated, Graf, on December 21, 2017 sold 24,100 shares of FedEx common stock at a price of $249.40 per share and received proceeds of $6,011,093. At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale. Defendant Graf is named as a defendant in the Securities Action.

31.     Defendant Kimberly A. Jabal ("Jabal"), has served as a director of the Company since 2013. In addition, defendant Jabal served as a member of the Audit Committee and IT Oversight Committee during the Relevant Period.  While the Company's stock price was artificially inflated, Graf, on November 1, 2017 sold 3,980 shares of FedEx common stock at a price of $225.60 per share and received proceeds of $897,703. At the time of the sale she had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

32.     Defendant Shirley Ann Jackson ("Jackson"), has served as a director of the Company since 1999. In addition, defendant Jackson served as a member of the Audit Committee, Compensation Committee, and Governance Committee during the Relevant Period. While the Company's stock price was artificially inflated, Jackson, on November 2, 2017 sold 3,730 shares of FedEx common stock at a price of $225.70 per share and received proceeds of $841,860. At the time of the sale she had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

33.     Defendant R. Brad Martin ("Martin"), has served as a director of the Company since 2011. In addition, Martin served as a member of the Audit Committee and Governance Committee during the Relevant Period.

34.     Defendant Joshua Cooper Ramo ("Ramo"), has served as a director of the Company since 2011. In addition, defendant Ramo served as a member of the Audit Committee and IT Oversight Committee during the Relevant Period.

35.     Defendant Susan C. Schwab ("Schwab"), has served as a director of the Company since 2009. In addition, defendant Schwab served as a member of the Compensation Committee and IT Oversight Committee during the Relevant Period.

36.     Defendant Frederick W. Smith ("Smith"), the founder of the Company, has served as a director, Chairman of the Board and CEO of the Company since 1998 and as Chairman of FedEx Express since 1975. Previously, Smith served as the President of the Company from 1998 to 2017, as a director, Chairman of the Board, President and CEO of FedEx Express from 1983 to 1998, as CEO of FedEx Express from 1977 to 1998, and as President of FedEx Express from 1971 to 1975. While the Company's stock price was artificially inflated, Smith, on April 18, 2018 sold 124,000 shares of FedEx common stock at a price of $256.00 per share and received proceeds of $31,742,181. At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

37.     Defendant David P. Steiner ("Steiner"), has served as a director of the Company since 2009. In addition, defendant Steiner served as the Chair of the Governance Committee during the Relevant Period. Defendant Steiner is also the Board's Lead Independent Director. While the Company's stock price was artificially inflated, Steiner, on January 5, 2018 sold 3,016 shares of FedEx common stock at a price of $266.25 per share and received proceeds of $802,405. At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

38.     Defendant Rajesh Subramaniam ("Subramaniam"), was at all relevant times the Company's Chief Marketing and Communications Officer and Executive Vice President during the Relevant Period. While the Company's stock price was artificially inflated, Subramaniam, on

September 21, 2017 sold 6,750 shares of FedEx common stock at a price of $219.60 per share and received proceeds of $1,482,401. At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

39.     Defendant Paul S. Walsh ("Walsh"), has served as a director of the Company since 1996. In addition, defendant Walsh served as the Chair of the Compensation Committee during the Relevant Period. While the Company's stock price was artificially inflated, Walsh, on April 18, 2018 sold 4,400 shares of FedEx common stock at a price of $255 per share and received proceeds of $1,122,000. At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

40.     Defendant Michael C. Lenz ("Lenz") was the Company's Treasurer and Corporate Vice President during the Relevant Period. Defendant Lenz is named as a defendant in the Securities Action.

41.     James L. Barksdale ("Barksdale") worked for FedEx for 13 years from 1979 to 1992, serving as chief information officer, then executive vice president and chief operation officer. He was a director up until his retirement immediately before the 2018 annual meeting. Barksdale served on the IT Oversight Committee during the Relevant Period.

42.     John C. Inglis ("Inglis") has been as a Director since 2015. He has served as Chairman of the IT Oversight Committee and a member of compensation and nominating and governance committees, during the Relevant Period.

43.     Collectively, defendants Bronczek, Colleran, Cunningham, Edwardson, Ellison, Graf, Jabal, Jackson, Martin, Ramo, Schwab, F. Smith, Steiner, Subramaniam, Walsh, Lenz, Barksdale and Inglis are referred to herein as "Individual Defendants."

44.     Defendants Edwardson, Ellison, Jabal, Jackson, Martin, Ramo, Smith, Steiner, Walsh, Barksdale and Inglis shall collectively be referred to as the "Director Defendants."

45.     Defendants Edwardson, Jabal, Jackson, Martin, and Ramo are collectively referred to herein as the "Audit Committee Defendants."

46.     Defendants Barksdale, Inglis, Ellison, Griffith, Jabal, Ramo and Schwab are collectively referred to as the "IT Oversight Committee Defendants."

47.     Defendants Edwardson, Graf, Jackson, Jabal, Smith, Steiner, Walsh, Bronczek, Subramaniam, and Colleran are collectively referred to as the "Insider Trading Defendants."

48.     Defendants Edwardson, Smith, Steiner, Jabal and Walsh are collectively referred to as the "Insider Trading Director Defendants."

49.     The Individual Defendants participated in the issuance and preparation of materially false and/or misleading statements by FedEx, including press releases and SEC filings. Because of the Individual Defendants' positions with FedEx, they were aware of the adverse material non-public information about the business of FedEx, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

## INDIVIDUAL DEFENDANTS' DUTIES

50.     By reason of their positions as officers, directors, and/or fiduciaries of FedEx and because of their ability to control the business and corporate affairs of FedEx, Individual Defendants owed FedEx and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were

and those who still serve as directors or officers, are required to use their utmost ability to control and manage FedEx in a fair, just, honest, and equitable manner. Individual Defendants were and are, as to those who still serve as directors or officers, required to act in furtherance of the best interests of FedEx and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to FedEx and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. Individual Defendants, because of their positions of control and authority as directors and/or officers of FedEx, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with FedEx, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

51. To discharge their duties, the officers and directors of FedEx were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of FedEx were required to, among other things:

a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of FedEx;

b) Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority including ensuring that the Company met its

obligations to make full and complete disclosure within the requirements of the Federal Securities laws.; and

c) When put on notice of that the Company's business practices and operations conflict with applicable federal and state laws, rules, regulations and requirements or contractual obligations, to exercise good faith in taking appropriate action so as to assure that the business practices will be corrected to

eliminate the conflict, correct any misconduct and prevent its recurrence.

52.     The Defendants also have the obligation to refrain from trading in FedEx stock based on knowledge of adverse material non-public information.

53.     FedEx has established "Corporate Governance Guidelines," which state:

**<u>Basic Responsibilities of Board Members.</u>**

The fundamental responsibility of members of the Company's Board of Directors is to promote the best interests of the Company and its stockholders by overseeing the management of the Company's business and affairs. In doing so, Board members have two basic legal obligations to the Company and its stockholders: (a) the duty of care, which generally requires that Board members exercise appropriate diligence in making decisions and in overseeing management of the Company, and (b) the duty of loyalty, which generally requires that Board members make decisions based on the best interests of the Company and its stockholders and without regard to any personal interest.

**<u>Board Risk Oversight.</u>**

The Board of Directors has ultimate responsibility for risk oversight. While management has day-to-day responsibility for assessing and managing the Company's risk exposure, the Board of Directors and its committees provide oversight in connection with those efforts, with particular focus on ensuring that the Company's risk management practices are adequate and regularly reviewing the most significant risks facing the Company. The Board of Directors has delegated to each of its committees responsibility for the oversight of specific risks that fall within the committee's areas of responsibility.

**<u>Corporate Integrity and Compliance.</u>**

The Board of Directors is responsible for monitoring the Company's compliance with legal and regulatory requirements and overseeing the Company's corporate

14

integrity and compliance programs. The Board has delegated much of this responsibility to the Audit Committee. In furtherance of this responsibility, the Audit Committee will periodically discuss the implementation and effectiveness of the Company's corporate integrity and compliance programs with the Company's Executive Vice President, General Counsel and Secretary and Corporate Vice President and Global Chief Compliance & Governance Officer. In addition, the Audit Committee will periodically review the Company's Code of Business Conduct and Ethics, which sets forth the basic ethical principles all Board members, officers, employees and contractors must follow, and recommend any proposed changes to the Board of Directors for approval.

Employees, officers and directors must honestly and accurately report all business transactions. You are responsible for the material accuracy of your records and reports. Accurate record keeping and reporting are essential to the Company's ability to meet legal and regulatory obligations. All Company books, records and accounts shall be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record in all material respects. The financial statements of the Company shall conform in all material respects to generally accepted accounting principles and the Company's accounting policies. No undisclosed or unrecorded account or fund shall be established for any purpose. No false or misleading entries shall be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation. It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the Securities and Exchange Commission and in all other public communications.

54.     Further, the Company's IT Oversight Committee is specifically tasked with the Board's oversight responsibilities regarding information technology issues. The purpose of the IT Oversight Committee is governed by the IT Oversight Committee Charter, which states:

The purpose of the Information Technology Oversight Committee is to:

- Review major information technology ("IT")-related projects and technology architecture decisions;
- Assess whether the Company's IT programs effectively support the Company's business objectives and strategies;
- Assist Board oversight of cybersecurity risks and management efforts to monitor and mitigate those risks;
- Advise the Company's senior IT management team; and
- Advise the Board of Directors on IT-related matters.

55.     The IT Oversight Committee Charter states the responsibilities of the IT Oversight Committee members as follows:

**Cybersecurity**

4.  Review and discuss with management and the Board of Directors (i) the Company's cybersecurity risks and (ii) the steps management has taken to identify, assess and monitor those risks.

5.  Review and discuss with management (i) technologies, policies, processes and practices for managing and mitigating cybersecurity risks and (ii) the Company's cyber-attack incident response and recovery plan.

**IT Disaster Recovery**

6.  Review and discuss with management the Company's IT disaster recovery capabilities and contingency plans.

**Internal Controls**

7. Review and discuss with management the quality and effectiveness of IT systems and processes that relate to or affect the Company's internal control systems.

8.  Review and discuss with management and the Board of Directors (i) the Company's IT-related compliance risks, including IT-related internal audits, and (ii) the steps management has taken to identify, assess, monitor, manage and mitigate those risks.

9. Periodically report to and consult with the Audit Committee of the Board of Directors regarding IT systems and processes that relate to or affect the Company's internal control systems.

**Advisory Role**

10. Advise the Company's senior IT management team.

11. Stay informed of, assess and advise the Company's senior IT management team with respect to new technologies, applications and systems that relate to or affect the Company's IT strategy or programs.

    56.      In violation of the IT Oversight Committee Charter, and their general duties as members of the IT Oversight Committee, the IT Oversight Committee Defendants conducted little, if any, oversight of the Company's internal controls over the Company's IT matters, resulting in materially false and misleading statements regarding the Company's business, operational and compliance policies, and consciously disregarded their duties to monitor such controls. The IT

Oversight Committee Defendants' complete failure to perform their duties in good faith resulted in misrepresentations to the SEC, the investing public, and the Company's shareholders.

57.     In Addition, the Company's Audit Committee is specifically taksed with the Board's oversight responsibilities. The purpose of the Audit Committee is governed by the Audit Committee Charter, which states:

The purpose of the Audit Committee is to:

- Oversee the independent auditor's qualifications, independence and performance, and preapprove all audit and allowable non-audit services to be provided by the independent auditor;
- Assist Board oversight of (i) the integrity of the Company's financial statements and other financial information; (ii) the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting; (iii) the performance of the Company's internal auditors; and (iv) the Company's integrity and compliance programs, including compliance with legal and regulatory requirements; and;
- Prepare the audit committee report required to be included in the Company's annual proxy statement.

58.     The Audit Committee Charter states the responsibilities of the Audit Committee members as follows:

Financial Reporting

10. Review and discuss with management and the independent auditor the Company's quarterly and annual financial reports, including management's discussion and analysis of financial condition and results of operations, any certification, report, opinion or review rendered by the independent auditor in connection with such reports and any communications required by professional standards between the independent auditor and the Committee prior to the public release of such information.

11. Recommend to the Board of Directors whether the audited annual financial statements should be included in the Company's Annual Report on Form 10-K.

12. Review and discuss with management and the independent auditor (i) significant accounting and financial reporting issues and judgments made in connection with the preparation of the Company's financial statements and other public reports, including the Company's selection and application of significant accounting principles; (ii) any major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (iii) the development, selection and disclosure of critical accounting policies and estimates; (iv) the effect of financial reporting

and accounting initiatives and any related party or off-balance sheet transactions on the Company's financial statements; and (v) any analyses prepared by management or the independent auditor of the effect of alternative assumptions, estimates or GAAP methods on the Company's financial statements.

13. Review and discuss generally with management the types of information to be disclosed and the types of presentations to be made in the Company's earnings press releases and in any financial information and earnings guidance provided by the Company to analysts and rating agencies.

Internal Control Structure

14. Review, and discuss with management, the independent auditor and the Corporate Vice President - Internal Audit the adequacy and effectiveness of the Company's (i) financial reporting procedures and (ii) internal control structure, including its disclosure controls and procedures and internal control over financial reporting (including any material weaknesses, significant deficiencies or significant changes to internal controls).

15. Review and discuss with management, the independent auditor and the Corporate Vice President - Internal Audit the Company's annual internal control report and the independent auditor's attestation to such report.

16. Periodically receive reports from and consult with the Information Technology Oversight Committee of the Board of Directors regarding IT systems and processes that relate to or affect the Company's internal control systems.

Risk Assessment and Risk Management

17. Review and discuss with management and the Board of Directors (i) the guidelines and policies that govern the processes by which the Company assesses and manages its exposure to risk and (ii) the Company's major financial and other risk exposures and the steps management has taken to monitor and control such exposures.

Corporate Integrity and Compliance

18. Oversee and discuss with the Company's Executive Vice President, General Counsel and Secretary and its Corporate Vice President and Global Chief Compliance & Governance Officer the Company's compliance with legal and regulatory requirements and the implementation and effectiveness of the Company's corporate integrity and compliance programs, including the Company's Code of Business Conduct and Ethics. The Executive Vice President, General Counsel and Secretary and the Corporate Vice President and Global Chief Compliance & Governance Officer have authority to communicate directly with the committee.

19. Periodically review the Company's Code of Business Conduct and Ethics and recommend any proposed changes to the Board of Directors for approval.

20. Review and make recommendations to the Board of Directors regarding potential waivers of the Company's Code of Business Conduct and Ethics involving Board members or executive management.

21. Review and discuss with the Executive Vice President, General Counsel and Secretary, the Executive Vice President and Chief Financial Officer, other members of management, as appropriate, and the independent auditor any correspondence with, or other action by, regulators or governmental agencies and any employee complaints or published reports that raise material issues regarding the Company's financial statements or accounting policies.

22. Discuss with the Company's Executive Vice President, General Counsel and Secretary any legal matters that may have a material impact on the Company's financial statements, operations or reputation.

23. Review and discuss with the independent auditor any information obtained from the independent auditor with respect to illegal acts in accordance with Section 10A of the Securities Exchange Act of 1934, as amended.

24. Periodically review the Company's procedures for (i) the receipt, retention and treatment of complaints or concerns regarding financial fraud or accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by Company employees of complaints or concerns regarding financial fraud or questionable accounting or auditing matters.

59.     In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, the Audit Committee Defendants conducted little, if any, oversight of the Company's internal controls over public disclosures resulting in materially false and misleading statements regarding the Company's business, operational and compliance policies, and consciously disregarded their duties to monitor such controls over reporting. The Audit Committee Defendants' complete failure to perform their duties in good faith resulted in misrepresentations to the SEC, the investing public, and the Company's shareholders.

60.     In addition, as executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that

the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

61.     The Individual Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their own company's Code, Audit Committee Charter, and IT Oversight Committee Charter have inflicted, and will continue to inflict, significant harm on FedEx, as detailed herein.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

62.     FedEx is a multinational courier delivery services company headquartered in Memphis, Tennessee. The Company is known for its overnight shipping service and pioneering a system that could track packages and provide real-time updates on package location, a feature that has now been adopted by most other carrier services.

63.     According to its public filings, FedEx provides a broad portfolio of transportation, e-commerce, and business services through companies competing collectively, operating independently, and managed collaboratively, under the respected FedEx brand. These companies are broken into various business segments; FedEx Express, FedEx Ground, FedEx Freight, and FedEx Services, among others. FedEx Express is the world's largest express transportation company, offering time- definite delivery to more than 220 countries and territories. FedEx Ground is a leading North American provider of small-package ground delivery services.  FedEx Freight is a leading North American provider of less-than-truckload freight services. FedEx Services provides sales, marketing,

information technology, communication, customer service, technical support, billing and collection services, and certain back- offline functions that support FedEx's transportation segments.

**B.    FedEx Acquires TNT for $4.8 Billion**

64.    Although FedEx's U.S. business is strong, accounting for 76% of the Company's revenues in FY 2016 and commanding a substantial market share domestically, FedEx competes against UPS, DHL International GmbH ("DHL"), and other carriers internationally.

65.    To better compete internationally and boost its European presence, especially, FedEx announced on April 7, 2015 that it had entered into an agreement to acquire TNT, a Netherlands-based shipping company, for $4.8 billion. The proposed acquisition would be FedEx's largest acquisition since the Company's inception.

66.    In a call with analysts held on the same day, the Company's executives touted the benefits of the proposed acquisition of TNT, including the synergies that would be generated from the Company's legacy operations in Europe and TNT's business.

67.    The acquisition of TNT closed on July 4, 2016, after receiving approvals from TNT's shareholders and multiple regulatory bodies.

68.    After the acquisition was completed, FedEx pushed onward to integrate its legacy European business with TNT's business. During the integration process, on March 31, 2017, FedEx announced that TNT's financial results would be combined with its FedEx Express reporting segment, which would mean that public investors could no longer see TNT's operational results on a standalone basis.

69.    With the combined reporting in place, FedEx set the TNT Income Improvement Target, which would measure FedEx Express's operating income improvement over a three-year period attributable to the synergies created by acquiring TNT. The TNT Income Improvement Target

was set between $4.0 billion and $4.3 billion in fiscal 2020 as compared to $2.8 billion in operating income in fiscal 2017.

70.     TNT generated approximately $6.8 billion in revenue annually prior to the merger. TNT's delivery services are focused in Europe, the Middle East, Africa, Asia-Pacific and South America. TNT concentrates on providing shipping services to large and multinational companies in the industrial, automotive, high-tech and healthcare industries. While the majority of TNT's shipments are between businesses, TNT also offers business-to-consumer services to select consumers. TNT's shipping and delivery services are delivered through a combination of physical infrastructures such as hubs, depots and vehicles as well as electronic delivery systems.

71.     With the May 25, 2016 acquisition, TNT became a part of the FedEx Express segment of the Company. For fiscal 2017, the year ended May 31, 2017, TNT's results were announced both as an individual reportable segment and combined with the results of FedEx Express. In the first quarter of fiscal 2018, the period ended August 30, 2018, FedEx reported the results of FedEx Express and TNT within a single reporting segment, FedEx Express.

72.     Given its importance, FedEx provided investors with specific guidance to measure the value added by the TNT acquisition. In a March 21, 2017 press release announcing results for the quarter ended February 28, 2017, FedEx stated that by fiscal year 2020, the Company's integration of TNT would increase FedEx Express's operating income by $1.2 billion to $1.5 billion.

73.     On the March 21, 2017 earnings call that followed this announcement, Defendants touted the acquisition of TNT. Defendant Graf emphasized that the Company continued "to have a great degree of confidence in the TNT acquisition and the value to the enterprise" and described the integration as "going extremely well." Defendant Graf further explained the expected synergies from the transaction stating, in pertinent part:

> We believe that the combination of the businesses is more than just an integration of the businesses, and we're positioning ourselves to leverage combined businesses

in a very powerful way. ***We see the combination of these two businesses as transformative and expect significant synergies from the integration.*** [2]

74.     In turn, Bronczek underscored the importance of the TNT acquisition stating, in pertinent part:

> The TNT acquisition, as I'm sure you know, is the largest in FedEx's history. And we have discussed this with you, previously; ***this provides extensive benefits to FedEx, including: rapidly accelerating our European and global growth around the world; substantially enhancing our global footprint***; and leveraging TNT's lower cost road networks in Europe, Middle East, and Asia, producing improved results for the entire Corporation.

75.     Bronczek emphasized that the Company's ability to meet the TNT Operating Income Improvement Target by 2020 was dependent on a successful integration of TNT into FedEx. Defendant Bronczek stated that "the integration is a key driver to FedEx Express FY20 operating income improvement target, of between $1.2 billion and $1.5 billion."

76.     About a year after the TNT acquisition was completed, on June 27, 2017, various news outlets reported that TNT's computer systems were experiencing outages due to a potential cyberattack. Later that day, FedEx confirmed that TNT was subject to cyberattacks.

**C.     Individual Defendants Downplay the Impact of NotPetya on TNT**

77.     On June 28, 2017, FedEx announced that TNT had been attacked by the NotPetya virus. In announcing the attack, FedEx assured investors that there had been no data breach and that the attack was limited to TNT. FedEx stated that "the operations of all other FedEx companies are unaffected, and services are being provided under normal terms and conditions."

78.     At the start of the Relevant Period, on September 19, 2017, the Company issued a quarterly earnings press release for the quarter ended August 31, 2017, and Defendants provided an update on the Company's operations in the wake of NotPetya. The Company disclosed that the attack

---

[2] Emphasis added throughout, unless otherwise noted.

impacted the results for the quarter by approximately $300 million. At the Company's earnings call to discuss FedEx's quarterly results, Bronczek explained that TNT's "international business that's significant around the world is what got affected the most. So that's high-yielding customer."

79.     Individual Defendants nonetheless tamped down market concerns regarding the impact of NotPetya, saying that service levels had already been largely restored. For example, the Company indicated that "most TNT Express services resumed during the quarter and substantially all TNT critical operations have been restored." The market reacted to the positive news of the Company's purportedly successful recovery from NotPetya, and the price of FedEx's stock increased by $4.50 per share, or 2.1%, to close at $220.50 per share on September 20, 2017.

80.     The reality was starkly different.  As a result of the Cyberattack, TNT's operations were heavily affected. TNT package deliveries to customers experienced significant delays and, worse, were lost throughout Europe. Because of the deterioration of the services, a significant amount of TNT's customers permanently took their high-margin parcel business to UPS and DHL. During the Relevant Period, unknown to investors, TNT was unable to recover the lost customers and their businesses.   The Individual Defendants, however, failed to disclose this information thereby rendering the Company to greater reputational and economic damage once the truth emerged.

**D.     Individual Defendants' False and Misleading Statements**

81.     Individual Defendants' misconduct consists of harming the Company with a series of materially misleading statements made by Individual Defendants, and their failure to act in a way such that there would be controls over public statements made by management to the investing public, to ensure that any such statements are materially complete and accurate and fully comply with the federal securities law.

82.     The misconduct began on September 19, 2017, when FedEx reported its first quarter 2018 results for the quarter ended August 31, 2017. The Company's quarterly revenues and earnings

missed analysts' estimates due to lost customer sales and remedial costs from the Cyberattack. Despite this near-term pressure at TNT, Defendants highlighted their recovery efforts from the Cyberattack and downplayed the lingering impacts on its business. In the first quarterly report, FedEx reaffirmed the TNT Operating Income Improvement Target stating, in pertinent part:

> We are targeting operating income improvement at the FedEx Express segment of $1.2 billion to $1.5 billion in 2020 from 2017 assuming moderate economic growth, current accounting and tax rules and continued recovery from the NotPetya cyberattack. This target includes TNT Express synergies as well as base business and other operational improvements across the global FedEx Express network.

83.     Further, the first quarter 2018 results positively described the Company's international growth and service mix and stated, in pertinent part:

> International export average daily volumes increased 2% in the first quarter of 2018 due to increased international economy shipments partially offset by the decrease in volume due to the NotPetya cyberattack. International export package yields increased 2% in the first quarter of 2018 due to higher fuel surcharges and favorable service mix, partially offset by lower base rates.

84.     For example, during the related earnings call on September 19, 2017, certain Individual Defendants assured investors that ***all critical*** TNT systems were fully restored and fixes to its customer- specific systems were expected to be finalized by the end of September 2017. Company Executives also reaffirmed the TNT Income Improvement Target, stating in pertinent part:

> ***We're confident of our prospects for long-term profitable growth, and we reaffirm our commitment to improve operating income at*** FedEx ***Express segment by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017.*** Our overall goals remain to increase earnings, cash flows, returns, and margins

85.     During the same call, Bronczek told investors that TNT service was at "pre-crisis levels," and that fixes to customer-specific solutions were expected to be finalized and restored by the end of September 2017 "just in time for peak shipping," stating in pertinent part:

> Given the discussion around the impact of the cyberattack on TNT, I thought it [was] very important to point out the underlying fundamentals of the FedEx Express business remain very strong.

In particular, International Export Package revenue for the segment grew 4% in the quarter after absorbing the impact of the cyberattack. And we have made significant progress on the recovery of the TNT business and IT systems.

From a customer perspective, our teams are executing a detailed, thorough, and customer-focused plan, targeting and restoring customer volumes to our expected levels. This plan includes leveraging our senior officer team on sales calls to instill confidence with customers so that we can fully meet their expectations.

***Our service levels within Europe have been restored to pre-crisis levels.*** And in August, this past month of 2017, our service levels were actually above those a year ago in August of 2016. Tremendous work by the operations team.

With strong service levels and operations returning to near-normal capabilities, our focus now shifts to finalizing the restoration of certain key customer-specific solutions and their systems. ***We expect these IT capabilities to be restored by the end of this month, enabling business-as-usual operations with full capabilities across all customer segments just in time for peak shipping***

86.     Bronczek also said that "core shipping services are back in place," TNT had "returned to near-normal operations" and that a "significant portion of TNT customer base was retained." Bronczek commented, in pertinent part:

Immediately following the attack, we implemented contingency plans that leveraged our global networks to minimize the impacts to customers, including transporting TNT Express packages within the FedEx Express network.

Key assets in the recovery have been the FedEx air network and the TNT European road network, which have allowed us to retain a significant portion of our TNT customer base. These networks are the cornerstones for growing our business and will be leveraged as we return our volumes to expected levels.

I am very pleased to announce that our core shipping services are back in place with all TNT Express depots, hubs and operating facilities . . . Since then, we have returned to near-normal operations with the restoration of our pickup and delivery systems, courier handheld technology and intraregional air networks.

87.     Carter provided additional details regarding the recovery from the NotPetya virus and assured investors that TNT systems were largely "restored" to a "near-normal state, with virtually all critical systems up and available." Defendant Carter stated, in pertinent part:

> Leveraging every available resource, we have restored the TNT systems to a near-normal state, with virtually all critical systems up and available.

88.     Carter also asserted that the NotPetya outbreak would "expedite" rather than delay the integration of TNT into FedEx Express. Defendant Carter indicated:

> Our business, operational and IT teams are converting adversity into advantage by revisiting our integration strategy. Integration efforts will be expedited. This will enable us to reduce dependency on TNT legacy systems and will also broaden services and capabilities through our powerful combined networks.

89.     Based on the numerous statements made by Individual Defendants as detailed above, analysts expressed a positive view of the integration of TNT and the progress of the recovery from NotPetya. For example, on September 19, 2017, a Stephens Inc.'s analyst report commented, in pertinent part:

> With 1Q results, ***FDX [FedEx] removed a big unknown from the story*** around the impact of the cyber-attack and we believe the decks have been cleared. Encouragingly, 1Q18 core results topped our prior expectations as we believe ***underlying trends in the business remain strong***.

The Stephens Inc. report also found it encouraging that the Company reiterated the TNT Income Improvement Target.

90.     On September 19, 2017, Stephens Inc.'s issued an analyst report entitled "F1Q18 Recap; FY18 Expectations Reset While LT Opportunity Remains Unchanged," which interpreted the Company's reiteration of the TNT Improvement Target as an indicator that the ramifications of the NotPetya virus were not especially significant. Stephens Inc. commented, in pertinent part: "FDX does not expect any long-term market share loss stemming from lost revenue following the cyber-attack which we find encouraging and believe showcases the potential strength and attractiveness of the combined businesses to customers in the marketplace." The report also echoed Individual Defendants' assurances that "FDX acted quickly to get TNT's network back operational and as of now all key systems and operations are back up and running with the only remaining portion being some customer specific solutions." Stephens Inc. concluded that "[o]ur sense is that while a

significant amount of volume was directed away from FDX initially following the cyber- attack, a majority of this volume was shifted back to FDX as the network operations were restored, which is encouraging and we believe implies there will not be an on-going market share loss."

91.     Likewise, on September 19, 2017, BMO Capital Markets issued an analyst report entitled "Results Showcase Strong Fundamentals; Cyber Attack Impact Transient" confirming that Individual Defendants' positive representations regarding the recovery from NotPetya had their intended impact on the market. The report noted that FedEx reaffirmed the TNT Income Improvement Target and concluded that it "view[ed] the cyber attack issue as transient and continue to see a path to significant growth in EPS in the coming three years and improvement in free cash flow and ROIC." BMO Capital Markets also reflected FedEx's accelerated integration plan positively and commented that the Company's plans "may cause pull forward of integration costs planned for later in the plan but should also produce quicker benefits."

92.     On September 19, 2017, Barclays Equity Research issued an analyst report which also indicated that the market had accepted FedEx's positive message regarding its operations in the wake of the NotPetya virus. The report concluded, in pertinent part: "[g]iven material challenges from network hacking at the recently acquired TNT European business, we take today's results at FedEx with a sigh of relief."

93.     Oppenheimer maintained an "Outperform" rating and its $229.00 target on the Company's stock based on supposed recovery of TNT systems and the TNT Income Improvement Target. Deutsche Bank also maintained its "Buy" rating and $235.00 price target on the Company's stock based on the unchanged TNT Income Improvement Target.

94.     On September 20, 2017, the day following the earnings call, FedEx stock increased $4.50 per share, or roughly 2.1%, to close at $220.50 per share.

95.     On December 19, 2017, FedEx issued a press release announcing its financial results for the quarter ended November 30, 2017. FedEx also disclosed that it was projecting earnings of between $11.45 and $12.05 per share for fiscal 2018. In explaining the Company's increased projection, Defendant Graf stated: "[w]e are increasing our fiscal 2018 forecast, due to enhanced revenue quality, solid demand trends and our success in restoring business impacted by this summer's cyberattack." The Company also reported that it was accelerating the integration of TNT in light of the NotPetya virus. The Company stated, in pertinent part:

> The capital spending forecast for fiscal 2018 remains $5.9 billion. The company is accelerating the integration process and increasing investments to move TNT Express information technology and operational infrastructure to FedEx infrastructure due to the recent cyberattack at TNT Express. As a result, the total TNT Express integration program expense through fiscal 2020 is now estimated to be approximately $1.4 billion, up from the previous $800 million estimate, of which $450 million is expected to be incurred in fiscal 2018.

96.     Graf also positively described the Company's growth and profitability of TNT, and reaffirmed the TNT Income Improvement Target representing, in pertinent part:

> We are increasing our fiscal 2018 forecast, due to enhanced revenue quality, solid demand trends and our success in restoring business impacted by this summer's cyberattack . . . [w]e expect to see improved results in our fiscal second half, and we reaffirm our commitment to improve operating income at the FedEx Express segment by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017.

97.     On December 19, 2017, FedEx reported positive results for its second fiscal quarter ended November 30, 2017. During FedEx's second quarter 2018 earnings call, Defendant Smith touted TNT's successful recovery from the Cyberattack, and stated the Company was "on target" to achieve the TNT Income Improvement Target, stating in pertinent part:

> ***We're very proud of the progress the FedEx team has made in recovering from the effects of the cyberattack at TNT.*** Let me express our appreciation to the thousands of FedEx professionals who worked around the clock and tirelessly to mitigate this unprecedented event. Dave will update you in his discussion of overall global operations.

We expect yield and volume growth at all of our transportation segments will support revenue and earnings growth in the second half of fiscal 2018. ***Our plans remain on target to improve operating income at the FedEx Express segment by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017*** and our goal remains to increase earnings, margins, cash flows and returns and we are confident that we can do so.

98.     On the same call, Graf also stated that FedEx's international volumes had increased despite the Cyberattack, and also reaffirmed the TNT Income Improvement Target, stating in pertinent part:

> ***Despite the challenges from the cyberattack, total international average package volume increased 5%.***
>
> ***We remain committed to our target of $1.2 billion to $1.5 billion in additional operating profit for the FedEx segment in FY 2020 versus FY 2017***, which includes TNT synergies as well as base business and other operational improvements across the entire global FedEx Express network.

99.     Likewise, Bronczek touted that TNT's service levels and operations were "back to normal," and that TNT's volumes and cost efficiencies were improving, stating in pertinent part:

> First, let me start off with FedEx Express. They grew their revenues and profits, as Alan just mentioned, despite the impact of the TNT Express cyberattack. ***The underlying fundamentals of the business remain very strong with higher base rates and growth in the international package and freight services. Cost efficiencies are also improving.*** For example, we continue to see higher aircraft fleet reliability, which increases our productivity.
>
> ***I'm also very happy to say that at TNT, we are seeing strong service levels and operations are back to normal after the June cyberattack. The IT recovery process is complete. We have improved our reliability, we have improved our security, and we are also increasing our investments to expedite portions of the integration process.***

100.    Later in the earnings call, Defendant Graf, in response to an analyst inquiry regarding TNT integration expenses, suggested that the NotPetya virus had accelerated rather than delayed the integration of TNT into FedEx Express. Defendant Graf explained that "as a result of the cyberattack . . . we decided to move much more aggressively on hardening and turning to FedEx platforms . . ." Along those lines, Defendant Carter added: "on the heels of the cyberattack, we've

become much more aggressive about improving the security posture, reliability and speeding up the integration of the technology platforms."

101.    On December 20, 2017, the Company filed its Quarterly Report on Form 10-Q, which presented its financial results for the quarter ended November 30, 2017. The Company again described the recovery from the NotPetya virus in positive terms claiming that services were "fully restored." The Company further stated, in pertinent part:

> As previously announced, on June 27, 2017, the worldwide operations of TNT Express were significantly affected by the cyberattack known as NotPetya. Immediately following the attack, contingency plans were implemented to recover TNT Express operations and communications systems, and substantially all TNT Express services were fully restored during the first quarter of 2018. All of TNT Express's critical operational systems have now been fully restored, critical business data has been recovered and shipping services and solutions are back in place. However, not all customers are shipping at pre-attack volume levels.

102.    The Company further positively described the growth of FedEx Express' international revenue and attributed this growth, in part, to "favorable service mix." The Company claimed, in pertinent part, that: "International export package yields increased 4% in the second quarter and 3% in the first half of 2018 due to higher fuel surcharges, favorable exchange rates and favorable service mix, partially offset by lower base rates."

103.    Analysts again reacted to Individual Defendants' positive update on the status of the TNT integration into FedEx Express. For example, on December 19, 2017, an analyst at Wolfe Research noted that "FDX expects the TNT cyber-attack to have a minimal impact on EPS in 2H." Likewise, an analyst report issued by Oppenheimer Equity Research on December 20, 2017, commented that "FY18 adjusted EPS guidance increased from [$12.70 to $13.30] as FedEx's operating smoothly post its TNT cyberattack issues."

104.    Following the above conference call and news, FedEx stock increased $8.53 per share, or 3.5%, to close at $251.07 per share on December 20, 2017.

105.     On March 21, 2018, FedEx reported positive results for its third fiscal quarter ended February 28, 2018. In addition, the Company raised its fiscal 2019 earnings forecast. During FedEx's third quarter 2018 earnings call, Graf reaffirmed the FedEx Express 2020 operating income target, stating in pertinent part:

> "As Fred mentioned, *we remain committed to our target of $1.2 billion to $1.5 billion in additional operating profit for the FedEx Express segment in FY 2020 versus FY 2017*, which includes TNT synergies as well as base business and other operational improvements across the global FedEx Express network."

106.     With respect to the recovery from NotPetya, the Company positively represented that "TNT Express's critical operational systems were fully restored." The Company stated, in pertinent part:

> Immediately following the attack, contingency plans were implemented to recover TNT Express operations and communication systems, and substantially all TNT Express services were fully restored during the first quarter of 2018. As of the second quarter of 2018, of all the TNT Express's critical operational systems were fully restored, critical business data was recovered and shipping services and solutions were back in place.

107.     In a related earnings call, Bronczek spoke regarding the TNT integration and restoration of its service levels post-Cyberattack, stating in pertinent part:

> I also want to provide an update on our TNT integration. As you know, this was the most significant acquisition in our company's history, and dramatically improves our global capabilities and competitive posture. *I'm happy to say that, at TNT, we are seeing strong service levels, and the integration is accelerating. A key element of our acceleration plan was to enable the flow of packages between the legacy TNT and FedEx systems prior to full integration.* This allows us to direct volumes to the highest service, but the lowest cost networks. This capability is expected to be in place by May 31 of this year.

108.     Bronczek further stated that the Company expected to complete the integration one year earlier than previously anticipated (by fiscal 2019 as opposed to by fiscal 2020). Defendant Bronczek stated, in pertinent part:

> A key element of our acceleration plan was to enable the flow of packages between the legacy TNT and FedEx systems prior to full integration. This allows us to direct volumes to the highest service, but the lowest-cost networks. This

32

capability is expected to be in place by May 31 of this year. We are accelerating the migration of the FedEx clearance operations and systems as well, retiring dozens of legacy TNT applications. Our investments in strengthening the IT environment continue on an accelerated pace. We have made significant investments to improve the TNT information security posture, and we'll continue to do so. The integration of our global sales force, originally expected to be complete in FY 2020, is now scheduled to be complete one full year early.

109.    Smith finally addressed questions from certain analysts regarding TNT's volumes

post-Cyberattack, stating that TNT volumes were back to pre-Cyberattack levels:

The second is from Jack Atkins of Stephens. To what degree was the June cyberattack at TNT negatively impact 3Q results, I guess, it did negatively impact 3Q results at Express, and would you expect any lingering impact in the fourth quarter? Now, I think these questions from Todd and Jack, and I'm going to ask again Dave and David Cunningham to amplify this, reflects a bit of a misunderstanding here, in that, please recall that when we started this fiscal year, we told you that we were no longer going to be talking about Express and TNT. So the numbers that are in the Express segment now are the combination of the two.

So the reality is, the FedEx Express volumes are growing, ***but the TNT volumes were adversely affected by NotPetya and we are now growing back up to where we would have been had this attack not happened***. And let me again give enormous thanks to our sales, our customer service and particularly our IT professionals that did the most unbelievable job of recovering from this attack, which the U.S. government now says was a government or a government-sanctioned attack on the Ukraine, and TNT was just a side victim of it.

So the fourth quarter will - I think, began to show these at a more granular fashion. ***But we're not seeing decline in Express traffic, in the fourth quarter we will have recovered most of the NotPetya volume from TNT now.***

110.    Cunningham followed up on Smith's comments, touting the "remarkable" recovery

of TNT's business over the last five months, stating in pertinent part:

Yeah, I'd just add a couple of comments to what Fred and Dave just said. I think, first thing you got to remember is the effects in Q3 were mostly one-off type of effects. Q4 ends up being a seasonally strong quarter and we've already told you what that's going to be. Our TNT network was fully restored and back to business as usual as of the end of 2017. ***The recovery of the business over the last five months has been remarkable. And given the value proposition of the TNT road networks, our freight volumes have been strong, and we are experiencing solid growth in these products.***

The cyberattack continues to have a lingering effect in the third quarter, and our existing customer base has not been fully restored - has not fully restored all volumes as they continue to gain confidence in our ability to provide service and recovery of our business.

Our outstanding performance during peak is evidence of the strength of our network and our recovery and our sales teams are leveraging this in the fourth quarter, and growing and winning business.

111.    On June 19, 2018, FedEx issued a press release announcing its fourth quarter and full year 2018 results. FedEx reported quarterly earnings and sales that met analyst estimates and reported $136 million in integration expenses for the quarter and $477 million in integration expenses for fiscal year 2018 – an uptick of nearly 30% in integration expenses from the prior quarter. This news began to signal to the market that there were significant problems with the TNT integration beyond those previously disclosed and reflected the impact of some of those previously-undisclosed risks. Despite these results, however, FedEx reported, among other things, higher-than-expected TNT integration expenses. On this news, FedEx stock fell $6.96 per share, or 2.69%, to close at $251.43 per share on June 20, 2018.

112.    Despite the above, Individual Defendants continued to offer positive commentary on the TNT integration and related financial performance metrics. During the earnings call that same day, Bronczek made the following positive statements about the TNT integration while reaffirming the TNT Income Improvement Target, stating in pertinent part: "***The successful integration of TNT and FedEx Express remains a key driver of the FedEx Express FY 2020 operating income improvement target of $1.2 billion to $1.5 billion over FY 2017's results.***"

113.    On the same call, Cunningham discussed the Company's "remarkable" and "outstanding" recovery following the Cyberattack, stating in pertinent part:

You can see in the results that we experienced year-over-year double-digit revenue growth in our international package and Freight Services this past quarter. While higher rates were certainly a major contributor, we're also seeing solid year-over-year growth in Freight traffic, a piece of our product portfolio that expanded

34

significantly through the addition of TNT. ***Again, the recovery of the business over the past several months has been remarkable and we certainly owe major thanks to our sales, customer service, and IT professionals who've done an outstanding job of recovering from this attack.*** (Emphasis added).

114.     Smith and Graf further discussed the increased integration expenses. The conversation went as follows:

**Frederick W. Smith FedEx Corporation - Founder, Executive Chairman & CEO:**

So Alan just mentioned that integration costs will be higher than initially expected. You're saying higher than the $1.4 billion guidance from last year. How much? [ ] Alan?

**Alan B. Graf FedEx Corporation - Executive VP & CFO:**

I'd say right now, based on what we're seeing, it's more like $1.5 billion, $100 million more. If we find additional opportunities, we'll keep you posted on that. But those are opportunistic as opposed to it's costing us more than we thought.

115.     Finally, Colleran commented on business growth and "customer loyalty" within the FedEx Express segment, stating in pertinent part: "Just like to add a comment to that as well. We greatly appreciate the loyalty that our customers have shown us as we went through this difficult period. And as you noted, ***I'm also glad to mention that we resumed year-over-year growth in the impacted segments of that business***." (Emphasis added).

116.     Although Individual Defendants positively described the state of the Company's recovery from NotPetya and the Company's ability to meet the TNT Operating Income Target, on the news of the increased TNT integration expenses, FedEx stock declined by $6.96, or 2.7%, to close at $251.43 on June 20, 2018.

117.     On July 16, 2018, FedEx filed its Form 10-K (the "2018 Annual Report") with the Securities and Exchange Commission for its fiscal year ended May 31, 2018. Within the filing, FedEx stated that its FedEx Express segment revenues increased "***despite impacts from the NotPetya cyberattack***," and that international export package yields increased in part due to, among other

reasons "***favorable service mix***." The Company also addressed the impact of NotPetya and affirmed that "substantially all TNT Express services were fully restored during the first quarter of 2018." The Company stated, in pertinent part:

> On June 27, 2017, the worldwide operations of TNT Express were significantly affected by the cyberattack known as NotPetya. Immediately following the attack, contingency plans were implemented to recover TNT Express operations and communications systems, and substantially all TNT Express services were fully restored during the first quarter of 2018. As of the second quarter of 2018, all of TNT Express's critical operational systems were fully restored, critical business data was recovered and shipping services and solutions were back in place. Our results for 2018 were negatively impacted by the NotPetya cyberattack by an estimated $400 million ($1.19 per diluted share) during the first half of the year, primarily from loss of revenue due to decreased shipments in the TNT Express network, as well as incremental costs to restore information-technology systems.

118.    Additionally, the Company further represented that it would meet the TNT Income Improvement Target stating, in pertinent part: "we are targeting operating income improvement at the FedEx Express group of $1.2 billion to $1.5 billion in 2020 from 2017, assuming moderate growth and current accounting rules."

119.    On September 17, 2018, FedEx released disappointing first quarter 2019 results. Individual Defendants noted higher variable compensation accruals and accelerated wage increases for certain hourly employees which, when considered collectively, negatively affected year-over-year results by $170 million.  On the same day, the Company held a call to discuss these earnings results. Individual Defendants Graf, Bronczek, Subramaniam, Smith, and Carter participated in the call, during which Graf disclosed that the Company was experiencing a negative service mix and explained that the Company's operating income was "partially offset by [a] shifting service mix..."

120.    On September 17, 2018, the Company filed its Quarterly Report on Form 10-Q, which presented its financial results for the quarter ended August 31, 2018. The Company disclosed that FedEx had incurred "TNT Express integration expenses totaling $121 million ($98 million, net of tax, or $0.36 per diluted share) in the first quarter of 2019, a $9 million increase from the first quarter of 2018." Further, the Company disclosed that during the quarter, the FedEx Express segment

was responsible for approximately $102 million of TNT integration expenses, a $14 million increase from the first quarter of fiscal 2018. The Company also disclosed that "changes in service mix following the NotPetya cyberattack negatively impacted operating margins in the first quarter of 2019."

121.    Smith's introductory comments described the Company's growth in a positive light and reaffirmed the TNT Income Improvement Target representing, in pertinent part: "[w]e're very optimistic about our prospects for profitable growth and remain confident we'll reach our goal to improve FedEx Express operating income by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017."

122.    At the question/answer portion of the earnings call, Subramaniam addressed an analyst's question regarding "opportunities for share gains with the combined TNT-FedEx network." In his answer, Subramaniam, who then served as the Company's Chief Marketing and Communications Officer and Executive Vice President, claimed that FedEx was "progressing well on the integration, and customers are already beginning to see this value." Subramaniam explained:

> And that opens up large international market segments which we are now extremely well positioned to gain significant share. And the good news here is we are well on our way to unlocking the value, and we are pleased with the progress. As Dave talked about, we are progressing well on the integration, and customers are already beginning to see this value. And all I can say here is that the sales and marketing teams all over the world are very excited to [] see the progress and really provide new value for our customers.

123.    In comments during the same call, Graf acknowledged that TNT was experiencing a less profitable service mix. Graf stated stated:

> While strong international volume growth reflects our recovery from the TNT cyberattack last year, the impact of operating income was partially offset by shifting service mix and the timing of variable compensation, aircraft maintenance and merit increases. As we continue to grow package volume, our revenue and overall operating income will benefit. We remain committed to achieving the $1.2 billion to $1.5 billion in operating income improvement at Express.

124.    On this news, FedEx stock fell $14.15 per share, or 5.5%, to close at $241.58 per share on September 18, 2018 after the reporting earnings of $3.46 per share in its first fiscal quarter of 2019 compared to the $3.80 per share that analysts had expected.

125.    On September 20, 2018, news outlets reported that Michael Holt would retire as FedEx Express Europe's regional COO at the end of September 2018, and that Holt would be replaced by Sean Healy.

126.    On September 24, 2018, during FedEx's Annual General Meeting with shareholders, Smith stated that the Company was "on track" to achieve the TNT Income Improvement Target. He further made positive statements regarding revenue growth at FedEx Express, as well as TNT service levels and integration efforts, stating in pertinent part:

> FedEx Express posted solid revenue growth and is on track to reach our target $1.2 billion to $1.5 billion improvements in operating income in fiscal 2020 versus 2017.

> \*       \*       \*

> ***We can now report we're seeing strong TNT service levels and our integration of TNT is progressing rapidly.*** Great thanks to the teams that worked around the clock and around the world to restore and better secure both the technology systems and our customers' trust in us. We're emerging from this huge challenge stronger than ever.

127.    On November 7, 2018, during the Robert W. Baird Industrial Conference, Individual Defendants continued to affirm the FedEx Express operating income guidance for 2020. For example, Defendant Lenz stated, in pertinent part:

> And as we get into the home stretch of completing the TNT integration here by May of 2020, that's going to drive tremendous value in terms of what we can leverage there, and that's a key element of the target we've got out there of improving our Express business' operating income by $1.2 billion to $1.5 billion in our fiscal year 2020 versus the fiscal year 2017 baseline.

128.    At the same conference, Lenz discussed how TNT had retained customers in the wake of the Cyberattack, stating in pertinent part:

One of the aspects of what gives us confidence in our value are the capabilities that the TNT assets will provide. And in particular, when you put them together with our unmatched global network is -so five, six years ago, UPS tried to acquire TNT and that was ultimately prohibited by regulatory authorities. Well, of course, we were in trying to take their customers along the way there amidst the disruption and uncertainty, and we couldn't take TNT's customers because they were loyal and the value of what TNT was able to do was significant. Well, similarly now we're experiencing that as well that, despite the cyberattack, the customers stuck with us. So, that's what gives us the confidence and basis that, look, this is going to drive even value beyond the immediate of what we're targeting here in FY 2020.

129.    On December 7, 2018, FedEx surprised investors by announcing that on December 3, 2018, Cunningham had entered into a separation agreement with FedEx to retire by December 31, 2018 as the CEO of FedEx Express and would be replaced by Subramaniam in that role. Analysts immediately suggested that Cunningham's "retirement" was a result of performance issues within the FedEx Express segment.

130.    Related to this news, on December 11, 2018, Stephens Inc. issued a report discussing Cunningham's departure noting that "while skepticism has been growing around FDX's ability to hit its profit goals at Express in FY20, many investors are taking this leadership change to mean that FDX will lower its FY19 guidance and long-term Express profit outlook next week." The report noted:

With the rubber meeting the road over the next six months from an integration stand-point at TNT, it may have become clearer to FDX management that its F2H19 guidance (which anticipated a sharp improvement in TNT synergies) and FY20 targets were going to be difficult to achieve. As a result, we now expect FDX to revise its Express profit improvement timeline next week when it releases F2Q results and adjust its FY19 adj. EPS guidance modestly lower. We do not expect the total amount of EBIT growth ($1.2 bil. - $1.5 bil.) to change, but we would anticipate FDX now expecting this level of improvement by FY21, or 12 months later than originally expected.

131.    Also relating to these concerns, on December 12, 2018, Credit Suisse Equities issued an analyst report questioning the Company's ability to meet the TNT Income Improvement Target. The report commented:

With this as the backdrop, Friday's news that Express CEO Cunningham is out - in the middle of peak season nonetheless – was particularly unsettling. One can only think this is bad news;

39

otherwise the company would have announced it during its earnings release on Dec 18. Or, if something more unsavory in nature, surely an 8- k would have been disseminated (right?). With no further information from the company, the logical conclusion by the market appears to be: kiss the $1.2B-$1.5B target (and $20 of EPS in '20) good-bye.

132.    On the news of Cunningham's unexpected departure, FedEx stock dropped by $13.31 or 6.1% from an opening price of $214.70 to a closing price of $201.39 on December 7, 2018.

133.    The statements referenced above were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Individual Defendants or recklessly disregarded by them: (i) TNT's international service was largely disabled for six months due to the NotPetya virus; (ii) TNT was losing a significant proportion of its high-margin customers due to its failure to operate internationally; and (iii) NotPetya had substantially delayed, rather than accelerated, the integration of TNT into FedEx Express. As a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects, including its ability to meet the TNT Income Improvement Target.

## REVELATIONS

134.    On December 18, 2018, after the close of trading, FedEx released weak results for its second quarter 2019 ("2 Q 2019"). Among other things, FedEx lowered its fiscal 2019 outlook and told investors that the TNT Income Improvement Target would no longer be achievable by the end of fiscal 2020. The Company explained that "lower-than-expected express package volume due to European weakness that accelerated during the quarter and is expected to continue, and a change in service mix following the June 2017 cyberattack on TNT, will delay the anticipated realization of these benefits." During the related earnings call held that evening, Bronczek linked these changes to lower package volumes in Europe and stated that "[f]ollowing TNT's recovery from the cyberattack, we have seen an accelerated shift of our product mix to more freight than parcel, putting pressure on our system and of course our costs."

40

135.     On the same call, Graf revealed that the integration of TNT was not progressing at the previously touted pace due to, in part, "a change in service mix following the NotPetya cyberattack." Graf additionally alerted investors that the TNT Income Improvement Target was no longer achievable, stating in pertinent part:

> The timing and amount of integration expenses and capital investments in any future period may change as we continue to execute the integration of TNT. We expect to realize the benefits of the TNT acquisition that were anticipated when the **company was acquired,** although at a more moderate pace caused by reductions in base business levels due to increasing economic weakness during the second quarter and a change in service mix following the NotPetya cyberattack**.** As a result, we now expect the operating profit improvement goal of $1.2 billion to *$1.5 billion for Express over fiscal year '17 will not be realized in FY '20.*

136.     In connection with these comments, Bronczek also described the challenges to integrating TNT into FedEx Express and made clear that the long-touted benefits of the integration would be delayed. Defendant Bronczek stating:

> Our businesses are heavily dependent on IT solutions for the integration. For example, these require harmonization of our services and then corresponding redesign of our multiple customer platforms, including, of course, fedex.com and our customer automation tools. Our original integration planning contemplated the long lead time required to build these IT solutions and accordingly, the benefits of these efforts would occur towards the end of the integration. While changes in our revenue mix and softness in volume have impacted the timing of the realization of the financial benefits, we remain confident in the long-term value of the combination and synergies to be realized through a single pickup and delivery network, single air and road network, back-office efficiencies, and of course, mainly our revenue growth.

137.     Responding to analysts' questions regarding TNT, Bronczek revealed that TNT's high margin parcel business had failed to grow at the previous expected rate, stating:

> There is no question about the fact that I mentioned -- made in my comments that one of the things that TNT really did very well, and we continue to do well with TNT inside FedEx, is the freight product and their specialty freight product. So after the cyberattack that product came booming back because no one is better than we are in that product. So that product, of course, has a little bit different mix, a little bit different cost structure to it. We're focusing on our parcels as well. As you pointed out, the questioner pointed out, our volumes are growing, they're just not growing as fast as what we would like them to grow.

138.     On this news, FedEx stock dropped $22.50 per share, or roughly 12.2%, to close at $162.51 per share on December 19, 2018.

139.     Following FedEx's December 19, 2018 disclosure, analysts drastically slashed their price targets due to the Company's disappointing revelations related to the TNT integration and post-Cyberattack remedial measures. The analysts voiced heightened skepticism at the Company's ability to successfully integrate TNT, and some questioned whether Company Executives intentionally chose to maintain guidance on the TNT Income Improvement Target, thereby misleading investors.

140.     For example, on December 19, 2018, Barclays issued a report entitled "The TNT Mirage" which lowered FedEx's price target and voiced frustration about "the rapid change in management guidance regarding the supposed profit potential of TNT." The Barclays analyst further stated:

> Despite nearly a year of lagging Express segment results following the complete operational shutdown of TNT from a computer virus (missed our margin expectations 4 out of the last 5 quarters), FedEx management until today clearly articulated to the investor community that: 1) TNT was fully operational following the cyberattack; and 2) aggressive profit improvement plans were "confidently" on track . . . . *While we think Express results following the cyberattack clearly indicated mix recovery challenges in the TNT business, management chose to maintain guidance until today's cut.* Perhaps this analyst will be less trusting of management commentary going forward. (Emphasis added).

141.     Deutsche Bank also issued a report entitled "F2Q First Look . . . Bad," which criticized Individual Defendants' lack of transparency with regards to TNT:

> The commentary around Europe is not very satisfying, as it likely reflects significant underperformance at TNT, on which management is still not offering necessary details (we believe TNT volumes are more heavily skewed towards larger, palletized freight, as opposed to parcel, making the read-through to other global package- delivery companies less meaningful, in our view).

142.     Following the market's realization that FedEx had not been truthful about issues it faced, on June 26, 2019, a securities class action entitled *Rhode Island Laborers' Pension Fund v.*

*FedEx Corporation*, 19-cv-05990 was filed in the United States District Court for the Southern District of New York asserting that the statements alleged above were materially false and misleading during a class period of September 19, 2017 through December 18, 2018.

143.    As a result of the Individual Defendants' misconduct, the Company and its shareholders have been significantly damaged.

### A.    Disclosures after the Relevant Period

144.    The adverse but undisclosed business conditions that were caused by the NotPetya virus continued to impact FedEx's operations in the year following the Relevant Period. On February 14, 2019, shortly after Defendants' disclosure that the Company would not meet the TNT Income Improvement Target and that TNT/FedEx Express was floundering, FedEx announced that the Company's management would again be reshuffled and that Bronczek was resigning from his role as President and COO of the Company, effective February 28, 2019. The Company reported that Subramaniam would replace Bronczek in this role.

145.    Media viewed the abruptness of Bronczek's departure as suspicious. For example, a Bloomberg report issued on February 14, 2019 entitled "FedEx Jolts Wall Street With Surprise Exit of CEO's Deputy" quoted Satish Jindel of SJ Consulting Group, stating: "It just doesn't seem normal. You don't appoint someone to the board and then in two weeks you say he's retiring." The article also noted the recent abrupt departure of Defendant Cunningham: "Both Bronczek and Cunningham were involved in meshing the operations, an effort that was disrupted by a cyberattack at TNT that spurred customers to leave."

146.    FedEx continued to release negative news. On March 19, 2019, the Company reported disappointing earnings and revenue for the quarter ended February 28, 2019 and reduced FedEx's full-year guidance for its fiscal 2019. Further, the Company revealed that the TNT integration costs were now expected to exceed the previously projected $1.5 billion. On that news,

the price of FedEx stock dropped by $6.75, or 4.2%, from an opening price of $183.82 on March 19, 2019 to a closing price of $175.07 on March 20, 2019.

147.     During the earnings call on March 19, 2019, the Company's senior executives discussed the results for the quarter ended February 28, 2019 and underscored the problems impacting TNT throughout the Class Period – problems that were known by Individual Defendants but concealed from investors. With regard to the TNT integration, Graf made clear during the call that the Company was only now seeing improved service levels as well as the return of legacy customers at TNT. Graf stated:

> I think you heard Raj and Rob talk about what's happening with TNT integration, ***where we're now finally getting service improvements at lower cost***. We're speeding up the network by a day on 40% of traffic. ***Customers are coming back.*** So it's just a matter of time. We have another year of integration to go, but we definitely need a little bit better economic environment in Europe to get the full benefits of TNT. We will get the full financial benefits of TNT. I have no doubt. It's just a matter of when.

148.     Similarly, in response to an analyst's question about whether FedEx had been able to "regain share in the European parcel market following the restoration of TNT service levels in early January," Subramaniam explained that the high margin parcel business was in the process of improving. Subramaniam stated, in pertinent part:

> The short answer to that question is yes. We are seeing -- we are -- higher year-over-year growths every month. We're -- from the last 3 months, we've seen accelerating year-over-year increase in revenue and volume in the European parcel business. ***And as we have stabilized and improving now our service levels, it's not a surprise.*** Despite the economic headwinds in Europe, we now have a terrific value proposition. As I said in the opening remarks, we're releasing new value to our customers. We improved our service and the customers are responding. ***So we are seeing increased revenue, increased volume in our core parcel business.***

149.     Analysts continued to react negatively to the Company's announcement of disappointing earnings, stalled progress of the NotPetya recovery, and delays in the integration of TNT into FedEx Express. On March 19, 2019, an analyst report issued by Barclays' Equities lowered the full year 2020 earnings estimate for the Company by 11% referring to "limited visibility on

Express margin recovery, [and] a longer integration of TNT." Likewise, an analyst at Credit Suisse commented on March 20, 2019 that the Company was "Not Out of the Woods Yet on Express/TNT," and that "[g]iven prior execution challenges, this will continue to be a 'show me' story rather than a 'tell me' story." Finally, JP Morgan reduced its FedEx price target for the second time in three months, attributing the cut to rapid management turnover and the "failed TNT integration."

150.     FedEx continued to experience the negative impact of the Cyberattack. On June 25, 2019, FedEx released disappointing results for its third quarter 2019, which revealed the lasting effects of the Cyberattack. The Company also stated that the integration costs were estimated at $1.7 billion through fiscal 2021, much costlier than previously anticipated. On December 17, 2019, announcing the results for its fourth quarter 2019, FedEx lowered its guidance and projections for fiscal 2020.

## MATERIALLY FALSE AND MISLEADING PROXY STATEMENTS

151.     On August 14, 2017, FedEx filed a Schedule 14a, which contained a Notice of Shareholder Meeting (By order of the Board of Directors) and Proxy Statement (the "2017 Proxy Statement").

152.     The 2017 Proxy Statement contains a summary which states in part:

> FedEx's strong and independent Board of Directors effectively oversees our management and provides vigorous oversight of FedEx's business and affairs in support of our mission of producing superior financial returns for our shareowners by providing high value-added logistics, transportation and related business services through focused operating companies.

153.     The 2017 Proxy Statement also makes the following statement regarding its Corporate Governance Guidelines:

> The Board believes that FedEx's Bylaws and Corporate Governance Guidelines help ensure that strong and independent directors will continue to play the central oversight role necessary to maintain FedEx's commitment to the highest quality corporate governance.

154.     The above statements were materially false and misleading because in fact, at least with respect to disclosure made by management to the investing public and stock analysts, the Board of Directors did not effectively oversee management and provide vigorous oversight of FedEx's business affairs. Further, FedEx does not have effective Corporate Governance Guidelines because the Board did not have controls in place to provide assurance that management will have a reasonable basis for all statements it makes to stock analysts concerning FedEx's business, outlook and status of integration of new businesses.

155.     On August 13, 2018, FedEx filed a Schedule 14a, which contained a Notice of Shareholder Meeting (By order of the Board of Directors) and Proxy Statement (the "2018 Proxy Statement"). The 2018 Proxy Statement contains a summary which states in part:

> FedEx's strong and independent Board of Directors effectively oversees our management and provides vigorous oversight of FedEx's business and affairs in support of our mission of producing superior financial returns for our shareowners by providing high value- added logistics, transportation and related business services through focused operating companies.

156.     The 2018 Proxy Statement also makes the following statement regarding its Corporate Governance Guidelines:

> The Board believes that FedEx's Bylaws and Corporate Governance Guidelines help ensure that strong and independent directors will continue to play the central oversight role necessary to maintain FedEx's commitment to the highest quality corporate governance.

157.     On August 12, 2019, FedEx filed a Schedule 14a, which contained a Notice of Shareholder Meeting (By order of the Board of Directors) and Proxy Statement (the "2019 Proxy Statement").

158.     The 2019 Proxy Statement contains a summary which states in part:

> FedEx's strong and independent Board of Directors effectively oversees our management and provides vigorous oversight of FedEx's business and affairs in support of our mission of producing superior financial returns for our shareowners by providing high value-added logistics, transportation and related business services through focused operating companies.

159.     The 2019 Proxy Statement also makes the following statement regarding its Corporate Governance Guidelines:

> The Board believes that FedEx's Bylaws and Corporate Governance Guidelines help ensure that strong and independent directors will continue to play the central oversight role necessary to maintain FedEx's commitment to the highest quality corporate governance.

160.     The Director Defendants drafted, approved, reviewed, and/or signed the 2017, 2018 and 2019 Proxy Statements ("the Proxies") before they were filed with the SEC and disseminated to FedEx's shareholders. The Director Defendants negligently issued materially misleading statements in the Proxies.[3]

161.     In support of re-electing themselves, the Director Defendants highlighted their supposed oversight of the Company. In particular, the 2017 and 2018 Proxies assured stockholders that the Board and its committees regularly assess and manage the risks that FedEx faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. The 2018 Proxy stated:

> Board Risk Oversight
>
> The Board of Directors' role in risk oversight at FedEx is consistent with the company's leadership structure, with management having day-to-day responsibility for assessing and managing the company's risk exposure and the Board and its committees providing oversight in connection with those efforts, with particular focus on ensuring that FedEx's risk management practices are adequate and regularly reviewing the most significant risks facing the company. The Board performs its risk oversight role by using several different levels of review. Each Board meeting begins with a strategic overview by the Chairman of the Board and Chief Executive Officer that describes the most significant issues, including risks, affecting the company, and also includes business updates from the President and Chief Operating Officer and each reporting segment CEO. In addition, at least annually, the Board reviews in detail the business and operations of each of the company's reporting segments, including the primary risks associated with that

---

[3] These Proxy allegations are based solely on negligence. They are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants, and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the Proxy allegations and related claims.

segment. The Board also reviews the risks associated with the company's financial forecasts and annual business plan.

Additionally, risks are identified and managed in connection with the company's robust enterprise risk management ("ERM") process. Our ERM process provides the enterprise with a common framework and terminology to ensure consistency in identification, reporting and management of key risks. The ERM process is embedded in our strategic financial planning process, which ensures explicit consideration of risks that affect the underlying assumptions of strategic plans and provides a platform to facilitate integration of risk information in business decision-making.

The Board has delegated to each of its committees responsibility for the oversight of specific risks that fall within the committee's areas of responsibility.

THE AUDIT COMMITTEE reviews and discusses with management the company's major financial and other risk exposures and the steps management has taken to monitor and control such exposures and the implementation and effectiveness of the company's compliance and ethics programs, including the Code of Business Conduct and Ethics and the employee hotline program. In addition, the Audit Committee is responsible for reviewing and discussing with management the guidelines and policies that govern the processes by which the company assesses and manages its exposure to all risk, including our ERM process. The ERM process culminates in an annual presentation to the Audit Committee on the key enterprise risks facing FedEx.

THE INFORMATION TECHNOLOGY OVERSIGHT COMMITTEE reviews and discusses with management the company's cybersecurity risks and the technologies, policies, processes and practices for managing and mitigating such risks, and it reviews and discusses with management the quality and effectiveness of the company's information technology systems and processes, including the extent to which those systems and processes protect the company from technology- related risks.

162.    The above statements were materially false and misleading because in fact, at least with respect to disclosure made by management to the investing public and stock analysts, the Board of Directors do not effectively oversee management and provide vigorous oversight of FedEx's business and affairs and FedEx does not have effective Corporate Governance Guidelines because the Board did not have controls in place to provide assurance that management will have a reasonable basis for all statements it makes to stock analysts concerning FedEx's business, outlook and status of integration of new businesses.

## DERIVATIVE AND DEMAND ALLEGATIONS

163.    Plaintiffs bring this action derivatively in the right and for the benefit of FedEx to redress the breaches of fiduciary duty and other violations of law by Defendants.

164.    Plaintiffs will adequately and fairly represent the interests of FedEx and its stockholders in enforcing and prosecuting its rights.

165.    Because any such effort would have been futile, as set forth below, Plaintiffs did not make a demand on the Board.

166.    This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

167.    At the time this action was filed, FedEx's Board of Directors consisted of the following members: Edwardson, Ellison, Jabal, Jackson, Martin, Ramo, Schwab, Smith, Steiner, and Walsh.

168.    Because of their advisory, executive, managerial, and directorial positions with FedEx, each of the Defendants had knowledge of material non-public information regarding FedEx and were directly involved in FedEx's operations at the highest levels. Pursuant to FedEx Corporate Governance Guidelines,[4] the Board is obligated to "to promote the best interests of the Company and its stockholders by overseeing the management of the Company's business and affairs. In doing so, Board members have two basic legal obligations to the Company and its stockholders: (a) the duty of care; and (b) the duty of loyalty. The Corporate Governance Guidelines prescribe: "The Board of Directors is responsible for monitoring the Company's compliance with legal and regulatory requirements and overseeing the Company's corporate integrity and compliance programs."

---

[4] *See* FedEx Corporate Governance Guidelines: http://investors.fedex.com/governance-and-citizenship/policies/governance-

169.    The Director Defendants were directors throughout the time of issuance of the materially false and misleading statements referenced above, and therefore had a fiduciary duty to ensure that the Company's disclosures and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Each of the Director Defendants breached that duty and are liable for such action and inaction and therefore would not be able to independently assess any demand made.

170.    Plaintiffs have not made a demand on the Board of Directors to bring the causes of action alleged herein because such a demand would be futile. FedEx's Board of Directors is unable to make an impartial determination as to whether or not legal proceedings to redress the wrongdoing alleged herein are necessary because a majority of its members: (1) face a substantial likelihood of liability for (a) non-exculpated breaches of their fiduciary duties to the Company through their participation or acquiescence in the wrongdoing alleged herein, (b) complete failure to perform their oversight duties, and (c) failure to ensure the Company's compliance with legally mandated disclosure standards; and/or (2) are not independent from members of FedEx's Board of Directors who face a substantial likelihood of liability. In fact, each of them shares responsibility for the materially false and misleading statements in the Proxies and omissions of material fact contained therein.

171.    The Insider Selling Director Defendants sold FedEx stock while in possession of non-public materially adverse information about the prospects for FedEx's business and used that information to benefit themselves. Because the Insider Selling Director Defendants would have been responsible for consideration of any demand made, and because the five directors would face a substantial liability for breach of their fiduciary duties of loyalty in connection with the sales of stock, any demand upon them would be futile.

172.    The IT Oversight Committee Defendants, as members of the IT Oversight Committee, recklessly authorized, permitted, or failed to prevent FedEx to issue materially false and

misleading statements, and failed to timely correct any materially false and misleading statements made. The IT Oversight Committee Charter provides that the IT Oversight Committee Defendants are responsible for "assess[ing] whether the Company's IT programs effectively support the Company's business objectives and strategies." Further, the IT Oversight Committee Defendants are responsible for "assist[ing] Board oversight of cybersecurity risks and management efforts to monitor and mitigate those risks."

173.    Thus, the IT Oversight Committee Defendants were responsible for understanding the extent of the future impact of the Cyberattack on FedEx's finances ensuring that the Company not make misleading statements regarding the Cyberattack or to omit to disclose materials facts when addressing the Cyberattack and its impact on the Company's business.

174.    Through their knowledge or reckless disregard, the IT Oversight Committee Defendants caused the improper statements made by the Company. Accordingly, the IT Oversight Committee Defendants breached their fiduciary duties of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the IT Oversight Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties, so any demand upon them is futile.

175.    The Audit Committee Defendants, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for the "oversight of (i) the integrity of the Company's financial statements and other financial information; (ii) the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting; (iii) the performance of the Company's internal auditors; and (iv) the Company's integrity and compliance programs, including compliance with legal and regulatory requirements[.]"

176.     Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Through their knowledge or reckless disregard, the Audit Committee Defendants caused improper statements made by the Company. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of duties, so any demand upon them is futile.

## A.     Smith Lacks Independence

177.     Any demand made on Smith would be futile because of the various leadership positions he has held since the inception of FedEx. Smith is the founder of the Company and served as president of FedEx Express from June 1971 to February 1975. Between 1977 and 1998, Smith served as FedEx Express' CEO, and has served as the Company's chairman, CEO, and president since 1998.  In 2018, Smith had a base salary of $1,384,820. In addition, he received a targeted additional payout of 165% of his base salary plus a very substantial grant of stock options. Smith is, therefore, incapable of acting independently and demand is futile upon him.

## B.     Substantial Likelihood of Liability for the Entire Board of Directors

178.     The Individual Defendants acted in bad faith by breaching their fiduciary duties in failing to adequately manage the Company, which has severely and negatively impacted the Company's financial condition and future prospects.

179.     By failing to satisfy their fiduciary duties, Individual Defendants caused irreparable reputational harm to the Company, exposing the Company to millions of dollars of liability in securities class action lawsuits plus very substantial attorney's fees and expenses. The securities class action currently pending alleges that spokespersons for FedEx made numerous materially misleading statements to the investment community including numerous stock analysts in 2017 and 2018

regarding the resolution of a hacking issue with the TNT subsidiary and its impact on FedEx's ability to reach certain financial goals.

180.     Each Director Defendant had a duty to diligently ensure that there were procedures in place to prevent officers speaking on behalf of the Company from making materially false and misleading statements, including, but not limited to, information regarding the Company's business, performance, its integration of TNT, and the veracity of the Company's financial disclosures. It was the duty of the Defendants to properly evaluate this information and provide thorough guidance and governance to the Company. Defendants failed in these duties. Individual Defendants who sat on the Board evaluated this information and either intentionally or recklessly failed to put procedures in place to prevent the disclosure of materially false and misleading statements, or failed to ensure the disclosure of information necessary to prevent the statements from being materially false and misleading.

181.     Each Director Defendant also had a duty to properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times.

182.     Each Director Defendant also had a duty to remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws.

183.     Each Director Defendant faces a substantial likelihood of liability in this action because of his or her failure as a director to ensure that reliable systems of controls were implemented

and functioning effectively to prevent the Company from issuing materially misleading statements. Based on the size, scope, and blatancy of the wrongdoing, the Defendants must have known, or were reckless or grossly reckless in not knowing, that the statements disseminated during the Relevant Period were materially misleading, and/or Defendants, who are board members must have omitted material information necessary to prevent the statements from being materially misleading. Accordingly, the Defendants who are board members face substantial exposure to liability for their total abrogation of their duty of oversight. Because each of the Defendants who are board members faces a substantial likelihood of liability for unexculpated breaches of duty, demand is excused.

184.    If FedEx's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their own protection with corporate funds, i.e., monies belonging to the stockholders. However, Plaintiffs are informed and believe that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by FedEx against the Individual Defendants, known as the "insured versus insured exclusion."

185.    As a result, if the Individual Defendants were to sue themselves or certain of the officers of FedEx, there would be no D&O Insurance protection. This is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Individual Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy. Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting FedEx by prosecuting this action.

54

186.     The Board has proven time and time again that it is incapable of exercising independent judgment in deciding whether to investigate or bring actions that involve its individual members. There is no reason to believe that this action would be any different. Each of the Individual Defendants either participated directly in the wrongdoing alleged or are inextricably linked to defendants who so participated. For all of the aforementioned reasons, demand on the Board is futile and thus excused.

187.     Based on the Board's conduct, and its failure to take action against any wrongdoer, no FedEx shareholder would reasonably believe the Board would respond properly to a demand in good faith. Thus, demand is excused.

188.     Thus, this stockholder derivative action should be allowed to proceed.

## COUNT I

### Against Defendants Edwardson, Ellison, Jabal, Jackson, Martin, Ramo, Schwab, Smith, Steiner, Walsh, Barksdale and Inglis for Violations of Section 14(a) of the Securities Exchange Act of 1934

189.     Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.     The Section 14(a) Exchange Act claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants charged. The Section 14(a) Exchange Act claim alleged herein does not allege and does not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this non-fraud claim.

191.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or

for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title." 15 U.S.C. § 78l.

192.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

193.    Under the direction and watch of the Director Defendants, the 2017, 2018 and 2019 Proxy Statements failed to disclose: (1) that certain of the Defendants made materially false and misleading statements regarding the integration of TNT; (2) that FedEx had insufficient internal controls in place to prevent its officers from making statements to the investing public including analysts which had no basis in fact; and (3) as a result of the foregoing, certain of FedEx's public statements, as set forth above, were materially false and misleading.

194.    The Director Defendants also caused the Proxies to be materially false and misleading with regard to failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated.

195.    Moreover, the Proxies were false and misleading in their discussion of the Company's adherence to specific governance policies and procedures, including the Code of Ethics and Corporate Governance Guidelines, due to the Individual Defendants' failure to abide by them and making and/or permitting the Company to make the false and misleading statements and omissions of material fact referenced herein.

196.     In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading.

197.     The misrepresentations and omissions were material to Plaintiffs votes on the matters set forth for shareholder determination in the Proxies, including election of directors and ratification of the appointment of an independent registered public accounting firm.

198.     The materially false and misleading elements of the Proxies led to the election, and re-election of Defendants Edwardson, Ellison, Jabal, Jackson, Martin, Ramo, Smith, Steiner, Walsh, Barksdale and Inglis, which allows them to continue breaching their fiduciary duties to FedEx, except with respect to Barksdale after his retirement from the Board.

199.     The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxies.

200.     Plaintiffs on behalf of FedEx have no adequate remedy at law.

## COUNT II

### Against Defendants Edwardson, Ellison, Jabal, Jackson, Martin, Ramo, Schwab, Smith, Steiner, Walsh, Barksdale and Inglis for Violations of Section 20(a) of the Securities Exchange Act of 1934

201.     Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein

202.     Defendants Edwardson, Ellison, Jabal, Jackson, Martin, Ramo, Schwab, Smith, Steiner, Walsh, Barksdale and Inglis, by virtue of their positions with FedEx and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of FedEx and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. Defendants Edwardson, Ellison, Jabal, Jackson, Martin, Ramo, Schwab, Smith, Steiner, Walsh, Barksdale and Inglis had the power and influence, and exercised same, to cause

FedEx to engage in the illegal conduct and practices complained of herein.

203.    Plaintiffs on behalf of FedEx has no adequate remedy at law

## COUNT III

### Against All Defendants Derivatively for Contribution Under §§10(b) and 21D of the Exchange Act Against the Securities Action Defendants

204.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

205.    This claim is brought derivatively on behalf of the Company for contribution and indemnification against Defendants Smith, Graf, Bronczek, Subramaniam, Cunningham, Colleran and Lenz (the "Securities Class Action Defendants"), each of whom are named as defendants in the Securities Class Action.

206.    FedEx is named as a defendant in the Securities Class Action, which asserts claims under the federal securities laws for violations of §10(b) of the Exchange Act. If FedEx is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omission of some or all of the Securities Class Action Defendants as alleged herein. The Company is entitled to receive contribution from those defendants in connection with the Securities Class Action against the Company.

207.    As directors and/or officers of FedEx, the Securities Class Action Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the content of public statements about FedEx, and had the power and/or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

208.    The Securities Class Action Defendants are also liable under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution,

and §21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

209.    Accordingly, FedEx is entitled to all appropriate contribution or indemnification from the Securities Class Action Defendants, who are responsible for exposing FedEx to liability under the federal securities laws.

## Count IV
### Against Individual Defendants for Breach of Fiduciary Duties

210.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

211.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to (a) ensure that the Company was operated in a diligent, honest and prudent manner and was in compliance with all applicable federal and state laws, rules, regulations and requirements, as well as within the scope of its legal authority set forth in all contractual obligations, and (b) exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence when put on notice of problems with the Company's business practices and operations.

212.    As a direct and proximate result of Individual Defendants' failure to perform their fiduciary obligations, FedEx has sustained and will continue to sustain significant damages, in that FedEx has significant monetary exposure to the pending securities class action and will incur significant attorney's fees and expenses that it would not have incurred but for the misconduct of the FedEx has also suffered and will continue to suffer as a result of the loss of reputation to its corporate image and goodwill.

213.    Plaintiffs have no adequate remedy at law.

## COUNT V
### Against the Insider Trading Defendants for Insider Trading and Misappropriation of Information Belonging to Fed Ex

214.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

215.     At the time each of the Insider Trading Defendants sold his or her FedEx stock as set forth above, he or she knew about the material, non-public information described above, and sold FedEx stock on the basis of such information.

216.     The information upon which the Insider Trading Defendants based their decision to sell was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects. It was a proprietary asset belonging to the Company, which each of the Insider Trading Defendants misappropriated to his or her own benefit when he or she sold personal holdings in FedEx stock. Each of the Insider Trading Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of FedEx stock at the time of such sales.

217.     The Insider Trading Defendants' sale of FedEx stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith. Each of the Insider Trading Defendants is therefore liable to FedEx for insider trading.

218.     Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Trading Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Trading Defendants obtained thereby.

219.     Plaintiffs, on behalf of FedEx, have no adequate remedy at law.

## COUNT VI
### Against the Individual Defendants for Waste of Corporate Assets

220.     Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

221.     As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Class Action that they brought on with their improper statements. In addition, due to the Individual Defendants' mismanagement, the Company has been forced to interrupt its business and dedicate its resources and attention to restating and revisiting its past financial statements.

222.     As a result of the decision to allow the Company to operate in an environment devoid of adequate internal and financial controls, the Individual Defendants have caused FedEx to waste its assets by paying improper compensation and bonuses to certain executive officers and directors that breached their fiduciary duty.

223.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

224.     Plaintiffs, on behalf of FedEx, have no adequate remedy at law.

**COUNT VII**
**Against All Defendants for Unjust Enrichment**

225.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

226.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of FedEx and its shareholders.

227.     Plaintiffs, as a stockholders and representatives of FedEx, seek restitution from these Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

228.     Plaintiffs have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Declaring that Plaintiffs may maintain this action on behalf of FedEx, and that Plaintiffs are adequate representatives of the Company;

B.     Against all Defendants, jointly and severally, and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

C.     Directing FedEx to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, including the federal securities law, and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

D.     Creating a constructive trust for the benefit of FedEx with the profits gained by the Insider Trading Defendants as a result of their sale of FedEx stock while in possession of non-public materially adverse information;

E.     Awarding to FedEx restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

F.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, DE  19801
(302) 984-3800
bbennett@coochtaylor.com
*Attorney for Plaintiff*

**OF COUNSEL**

**BRAGAR EAGEL & SQUIRE, P.C.**
W. Scott Holleman
Marion C. Passmore
Garam Choe
Alexandra B. Raymond
885 3rd Avenue, Suite 3040
New   York,   New   York   10022
Telephone: (212) 355- 4648

*Attorney for Plaintiff Flaker*

**LEVI & KORSINSKY, LLP**
Gregory Nespole (gnespole@zlk.com)
55 Broadway, 10th Floor
New  York, NY  10006
(212) 363-7500 (phone)
(212) 363-7171 (fax)

*Attorneys for Plaintiff Payton*